## IKE MILLER ET AL. V. HENRY LETZERICH ET AL.

No. 4834.   Decided April 6, 1932.
(49 S. W., 2d Series, 404.)

*H. R. Clark,* of La Grange, for plaintiffs in error.

By working on an old levy a long way from another's land and which levy does not extend to the other land, but is whollly on the land of the person working on same and which levy does not divert water from its natural flow nor increases the volume of the water, such work on said levy does not violate any rights of any other person nor is it prohibited by any statute of our State.

Plaintiffs in Error when they began repairing said levy were in the rightful exercise of dominion over their own property and they could do anything they pleased to exercise this rightful dominion (Old River Co. v. Barber, 210 S. W., 758), so long as they did not damage the property of any one else in any manner.

This is still good sound law and when the statute was changed by our Legislature they intended this to be the law with the addition that the new statute "only inhibits impounding and diversion of surface water in such a manner as to dam-

age the property of another by overflow. North Texas Compress & Warehouse Co. v. Howard, 267 S. W., 1026.

A person cannot be deprived of the right to use and enjoy his property as he wishes so long as he does not interfere with his neighbor. He has a right to reclaim his land from flood waters so long as he does not damage his neighbor's land thereby. Wilkerson v. Garrett, 229 S. W., 666.

*Moss & Lowrey*, of LaGrange, for defendants in error.

Plaintiffs in error are not authorized, under the law, to impound and divert surface water, or even water from a stream, on their own land, when, in so doing, it redounds to the injury and damage of their neighbor.

Plaintiffs in error are not authorized, under the law, to construct dams, embankments, channels and ditches to impound surface water on their own land and thereby divert it on to the lands of their neighbors to their detriment and damage.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

In a suit brought by the defendants in error the trial court enjoined the plaintiff in error Isley and his tenant Miller from repairing an existing levee and ditch, and from extending it, which they were then doing, so as to divert the natural flow of surface waters from the land of Isley on to that of the defendants in error. This judgment was affirmed on appeal, and the case is before us by writ of error. 292 S. W., 560.

This opinion is confined to a discussion of the law of *surface waters due to precipitation, while flowing over the ground in a diffused state*. The topographic map in the record shows the locus of this controversy, and tells the story of the cause of the complaint better than descriptive words. We have caused a copy of the map, reduced in size and scale, to be prepared to accompany this opinion, for which due acknowledgment is made to the State Reclamation Department.

Taking the residence (marked "Isley Residence" by us for convenience) as the focal point, we will undertake to state the "lay of the land." The small sinuous contour lines pass through points of equal elevation above sea level. The Isley residence, on the highest ground shown, has an elevation of 225 feet. From this residence the terrane slopes downward at a comparatively low gradient east, south, and southwest. Letzerich's land is located about 4,000 feet south and southwest of the resi-

HYLETZERICH

IRVIN ISLEY

BROWN ESTATE

LAKE

CREEK

Isley
Res

LEGEND
FENCE
CONTOUR LINES
LEVEE
DITCH & CREEKS
DAM

REDUCED FOR
THE SUPREME COURT OF TEXAS
BY
TEXAS RECLAMATION DEPARTMENT

TOPOGRAPHIC MAP
SHOWING DRAINAGE CONDITIONS
ON LAKE
AT IRVIN ISLEY FARM
R.M. CRAVENS LEAGUE

dence, and is bounded, as shown by the map, on part by Isley's land. There is located on the Isley land a large depression, about 26 feet lower than the residence, which in times of rainfall becomes a lake of approximately 100 acres. Prior to 1915 those in possession of the land, remote grantors of Isley, constructed a ditch and levee, approximately 4,200 feet long, between the points "A" and "X" shown on the map. The 800 feet of levee and ditch under construction when this suit was instituted, and which the court ordered destroyed, is shown from "X" to "B." From point "C" to point "X," a distance of about 1,400 feet, the old levee consisted of two embankments, with a

ditch between them. The levee and ditch shown from "D" to "F," also on Isley's land, does not appear to be directly involved in this litigation. The evidence discloses, and the contour map shows, that all the rain water which falls west of the levee from "A" to "C," but for the ditch and levee would follow the natural slope of the land downward and enter the lake on Isley's land; that none of it would pass on to the Letzerich property until the lake overflowed, and then only in a diffused state. If the construction enjoined by the trial court should be permitted, this water would be excluded from the lake basin and caught by the levee and ditch, and would be caused to flow in a body on to the Letzerich land at point "B." In addition to the waters just named, those which fall west of the levee, between the points "C" and "B," if the enjoined construction should be completed, would be caught by the levee and ditch, and diverted, at least in part, from the normal course of the surface water flow; and, as thus controlled, made to enter Letzerich's land in concentrated form and at a different point, if in fact they would otherwise enter it at all.

The case is clearly one where the upper land owner, if permitted, would not only divert the natural flow of the surface water from his own land to that of the lower tenement, but where he would collect the surface water on his own land in the artificial drainway made by the levees and ditch, and in increased and unnatural quantities cast the same upon his neighbor, to the latter's injury.

Our statute with reference to surface waters, in so far as here involved, reads:

"That it shall hereafter be unlawful for any person, firm or private corporation to divert the natural flow of the surface waters in this State or to permit a diversion thereof caused by him to continue after the passage of this Act or to impound such waters, or to permit the impounding thereof caused by him to continue after the passage of this Act, in such a manner as to damage the property of another, by the overflow of said water so diverted or impounded, and that in all such cases the injured party shall have remedies, both at law and equity, including damages occasioned thereby."

This statute, enacted in 1915, was omitted from the codification in 1925, but was re-enacted in 1927, and is now article 7589a, 1930 Cumulative Supplement to Vernon's Annotated Texas Statutes. It is obvious that the levees and ditch of the plaintiffs in error violate this act. If the act is valid, and is

applicable to the constructions complained of, the judgments of the trial court and Court of Civil Appeals should be affirmed.

Plaintiffs in error say, in effect, that they have a vested right in the existence and use of the levee and ditch constructed prior to 1915, when it was lawful to construct them, and the statute here involved cannot have the effect, nor be given the effect, of making the previously constructed levee and ditch unlawful; that their rights thereto are vested, and any law which would deprive them of the value and use of the same, including the right to clean out the ditch and repair the levees, where filled or broken, would be retrospective and void. As shown by the court's decree, Isley and Miller were commanded to restore the surface of the land to its original state only between the points "B" and "X" of the levee, that section under construction when the injunction was served. They were not required to destroy any other portion of the levees and ditch. However, they were enjoined from doing anything with reference to the old levee and ditch which would have the effect of diverting the flow of the surface water from the Isley land to that of Letzerich. They may still retain the old levees and ditch for any lawful purpose, but they cannot use them in such manner as to divert the natural flow of the surface water to the injury of defendants in error.

We think the statute involved valid. Our reasons for this conclusion will now be stated.

In determining the power of the Legislature to pass laws affecting surface water rights for the State generally, we must necessarily consider the effect of the grants made by each sovereignty in their relationship to the subject. Lands in Texas have been granted by four different governments,—namely, the Kingdom of Spain, the Republic of Mexico, the Republic of Texas, and the State of Texas. Many millions of acres of land were granted by Spain, Mexico, and the Republic of Texas prior to the adoption by the latter of the Common Law of England as the rule of decision in 1840. Motl v. Boyd, 116 Texas, 82, 286 S. W., 458.

■ It is elementary that a change of sovereignty does not affect the property rights of the inhabitants of the territory involved. Kilpatrick v. Sisneros, 23 Texas, 113, 131; Murquis v. Blake, 24 Texas, 461, 466; Airhart v. Massieu, 98 U. S., 491, 496; Jones v. McMasters, 20 How. (U. S.), 8, 21; U. S. v. Percheman, 7 Peters, 87 (10 U. S., 397).

■ After the revolution by which Mexico gained her independ-

ence, the Spanish civil law prevailed in connection with the decrees and statute of the supreme government of Mexico. For four years after the successful struggle of Texas for independence, Texas retained the civil law as the rule of decision. The statutes in force in the Republic of Texas before the introduction of the common law are to be construed in the light of the Mexican civil law, and the validity and legal effect of contracts and of grants of land made before the adoption of the common law must be determined according to the civil law in effect at the time of the grants. 9 Texas Jurisprudence, pp. 301, 302, 303, secs. 4 and 5, p. 304, sec. 6, p. 315, sec. 16; White v. Gay's Exrs., 1 Texas, 384; Taylor v. Duncan, Dallam, 514; Means v. Robison, 7 Texas, 502; Foster v. Champlin, 29 Texas, 22; Mitchell v. Bass, 33 Texas, 260; Courand v. Vollmer, 31 Texas, 397; Berry v. Powell, 105 S. W., 345; Burr v. Wilson, 18 Texas, 368; Holdeman v. Knight, Dallam, 566; Sheldon v. Milmo, 90 Texas, 1; Sparks v. Spence, 40 Texas, 693; City of San Antonio v. Stumberg, 70 Texas, 366; Hanrick v. Barton, 16 Wall. (U. S.), 166; Sideck v. Duran, 67 Texas, 256; Motl v. Boyd, 116 Texas, 82.

■ From these authorities it is plain, we think, that whatever title, rights, and privileges the inhabitants of Texas received by virtue of land grants from the Spanish and Mexican governments, which were a part of the realty itself or were easements or servitudes in connection therewith, remained intact, notwithstanding the change in sovereignty and the subsequent adoption of the common law as a rule of decision. As to the rights of the owners of coterminous estates under the Mexican civil law, generally it may be said that the rain water which falls on lands is, so long as it remains on the land, the property of the owner, to do with as he pleases, in the absence of some prescriptive or contractual right. The second rule of the civil law is that lands lower than the coterminous estate owe a service to receive the burden of surface waters which may flow from the higher estate on to the lower, so long as the surface water from the dominant estate reaches the borders of the servient one *untouched and undirected by the hands of man.* The owner of the dominant estate, however, could use his land in the ordinary way for farming purposes, cultivating it, irrigating it, and making any reasonable use of it in good faith for the production of crops, even though such use might result in some change in the natural flow and quantity of the surface water which the servient estate was due to receive. Hall's Mexican Law (Ed.

1885), secs. 1369, 1370, 1371, 1372, 1375.  See also chapter 6, p. 533.

For other statements of the civil law, generally see 27 Ruling Case Law, p. 1140, secs. 72, 73, 78; 26 California Jurisprudence, secs. 494, 495, 498, 499, 500, 501; Farnham on Water Rights, vol. 3, sec. 889a.

■■ These rights of the owners of estates under the civil law are appurtenant to and a part of the land itself, and passed to them with the grants.  The right of the owner of the upper estate to have the surface waters falling thereon to pass in their natural condition on to the lands of the lower estate is a servitude or natural right in the nature of an easement over the lower estate of his neighbor.  It is a right of property, which inheres in the estate entitled to its benefit independent of any contractual or prescriptive right.  Hall's Mexican Law, secs. 1835, 1836, 1838, 1840; 19 Corpus Juris, p. 873, sec. 15; 26 California Jurisprudence, sec. 494; Gray v. McWilliams, 35 Am. St. Rep., 163, 166; Thompson on Real Property, vol. 1, sec. 598; Washburn's Easements and Servitudes (4th ed.), p. 487 (355), p. 23, sec. 19, p. 24, sec. 20, pp. 5, 6, secs. 4, 5, p. 9, sec. 8; Sherman's Roman Law in the Modern World, vol. 2, p. 168, secs. 595 to 600; Moyle's Institutes of Justinian (5th ed.), book 2, titles a and 3, p. 46; Buckland's Roman Law, pp. 258 to 263; Farnham on Water Rights, vol. 3, sec. 882, p. 2573. The right comes clearly within the accepted definitions of and has every essential quality of an easement, although, as stated before, it arises out of nature itself, and, as we have seen, was adopted and enforced by the doctrine of the civil law.  19 Corpus Juris, 864; 9 Ruling Case Law, p. 734, secs. 2, 3, 7, 10; Harrison & Co. v. Boring, 44 Texas, 255; Scripture v. Kent, 1 W. & W. Civ. Cas. Ct. App., sec. 1056; Texas & P. R. Co. v. Durrett, 57 Texas, 48, 51; Thompson on Real Property, vol. 1, secs. 280, 285, 295, 598; Jones on Easements, secs. 762, 763; see also Sherman's Roman Law in the Modern World, vol. 2, p. 172, sec. 600.  The right, being an easement, is a part of the realty itself, an interest in land, and is governed by the rules of law with reference to real property.  Authorities supra; 9 Ruling Case Law, p. 736, sec 3, p. 803, sec. 60, and authorities cited in the notes, p. 746, sec. 15; Texas & P. Ry. Co. v. Durrett, 57 Texas, 48; Toyaho Cr. Irr. Co. v. Hutchins, 21 Texas Civ. App., 274 280 (writ refused); Parsons v. Hunt, 98 Texas, 420, 426; Shepard v. G. H. & H. Ry. Co., 2 Texas Civ. App., 535, 538; Deyo v. Ferris, 22 Ill. App., 154; Jones on Easements, secs. 16, 17, 18, 22; Thompson on Real Property, vol. 1, secs.

283, 295, 299, 302. The right being a natural easement, arising out of the relationship of the dominant and servient estates, and being a part of the grants made by the sovereign to the owners of each of the estates, it is a vested right, protected by the Constitution. Thompson on Real Property, vol. 1, sec. 295, and cases cited in the notes; Lewis on Eminent Domain, p. 191, sec. 142, p. 96, sec. 88, p. 99, sec. 89; Story v. N. Y. Elevated Ry. Co., 43 Am. Rep., 146; Nesbitt v. Trumbo, 89 Am. Dec., 290; 9 Texas Jursiprudence, p. 521, sec. 89, p. 527, secs. 94, 95, p. 536, sec. 102.

■ From what we have said it necessarily follows that the adoption of the common law as a rule of decision could not affect the respective rights of coterminous owners under grants made by the public authorities while the Mexican civil law was in force.

The first legislative act of the state touching the subject of surface waters was in 1876, when what is now Revised Statutes, art. 6328, was enacted. This article reads:

"In no case shall any railroad company construct a roadbed without first constructing the necessary culverts or sluices as the natural lay of the land requires, for the necessary draining thereof."

This statute was a mere adoption of the civil law rule, in so far as it could be made applicable to railroads, and has been interpreted and applied generally by the courts of this State. Gulf C. & S. F. Ry. Co. v. Helsley, 62 Texas, 593; Gulf C. & S. F. Ry. Co. v. Donahoo, 59 Texas, 128; see also cases cited in notes Vernon's Anno. Texas Statutes, vol. 18, art. 6328.

After the enactment of this statute the status of the law of surface waters in this State may be stated as follows:

(a) The civil law applied to grants of land made prior to the adoption of the common law.

(b) The common law applied to grants made subsequent to its adoption in 1840.

(c) The statute quoted applied to all grants, regardless of their dates, on which or coterminous with which a railroad should be constructed.

We have just stated the rule of the civil law as to surface waters. The rule of the English common law as to surface waters is said by leading authorities to be the same as that of the civil law. 27 Ruling Case Law, p. 1140, sec. 720; Farnham on Waters, vol. 3, secs. 889, 889b; see also 8 California Law Review, p. 197; 33 Harvard Law Review, pp. 133, 138; Boyd v. Conklin, 52 Am. Rep., 831; Coulson & Forbes Law of

Waters (4th ed.), pp. 135, 140, 153; Gibbons v. Lenfestey, 84 L. J. P. C., 158.

We will not quote at length from the authorities. Mr. Farnham, in his work cited above, after reviewing at length the English cases, concludes:

"The common and civil law, therefore, appear to be the same so far as the right to have the water follow its natural course is concerned."

In the case of Boyd v. Conklin, supra, the Supreme Court of Michigan held that the owner of a lower estate could not erect thereon barriers against surface waters in such manner as to flood the upper lands of his neighbor. In discussing the question of the common and civil law applicable, the court concluded that the English common law and the civil law were similar, saying, in part:

"It was urged strenuously on plaintiff's behalf that there is a radical difference between the common and the civil law upon the subject of the relations of upper and lower estates as to water easements and servitudes, and that at common law the latter owes no service to the former in regard to the flow of surface water. * * * But it so happens that from the time of Bracton down attention has been frequently called by the common-law courts to the fact that the whole subject of rights in water has been defined by the civil-law writers in terms which substantially agree with the recognized rules of the common law.

&ast; &ast; &ast; &ast; &ast; &ast;

"As previously suggested, the rights of upper and lower owners are not treated by the common-law authorities as peculiar to either common or civil law, but as natural incidents to the land, which are and must be analogous as governed by universal jurisprudence, except where specially modified.

&ast; &ast; &ast; &ast; &ast; &ast;

"There seems to be no reason for attempting to draw distinctions between the civil and the common law on this subject. The authorities recognize the principles as in no sense conventional, or derived from any school of jurisprudence, but as resting on the immunity of one man's property from injury by another in violation of natural justice and in disregard of the relative conditions arising from its position. Each may do in using his own what is consistent with the fair interests of the other."

In the work of Coulson and Forbes on the Law of Waters

258

in English (4th ed., published in 1924), these distinguished authors state the rule as follows:

"The right of an upper proprietor to throw natural water on the lower land is a natural right inherent in property. 'The law,' said Lord Dunedin, 'may be stated thus: When two contiguous fields, one of which stands upon higher ground than the other, belong to different proprietors, nature itself may be said to constitute a servitude on the inferior tenement, by which it is obliged to receive the water which falls from the superior.' " Coulson & Forbes Law of Waters, p. 135; see also pages 140, 153.

The authorities cited appear to be conclusive of the question that the English common law rule as to surface waters is substantially the same as that of the civil law.

■ There is another rule, sometimes called the "common law rule," which is better named the "common enemy doctrine," which has been adopted by the courts of some jurisdictions, including our own, under the mistaken view that it was the rule of the common law. The "common enemy doctrine" is that surface waters are a "common enemy," and may be fought off in any way in which the land owner can best get rid of them, even though their diversion may injure the adjacent land owner. 27 R. C. L., p. 1143, sec. 74. Mr. Farnham states that the cases upon which this doctrine appears to be founded were those of the Massachusetts Supreme Court. This is undoubtedly correct. Farnham on Waters, vol. 3, sec. 889c; Gannon v. Hargadon (Mass.), 87 Am. Dec., 625. The words "common enemy" were first applied to surface waters by the Supreme Court of New Jersey in the case of Town of Union v. Durks, 38 N. J. Law (9 Vroom), 21; Farnham on Waters, vol. 3, sec. 889c, p. 2596. In this case the court held that the city was not liable for damages due to the diversion of surface water. In the opinion the Chief Justice uses this language: "Lord Tenterden forcibly expressed the legal idea when he said that *surface water* was the *common enemy* which every proprietor may fight and get rid of as best he may." (Italics ours). We have been unable to find an opinion by Lord Tenterden which announced any such doctrine, and the court cited none. In the case of The King v. Commissioners of Sewers for Pagham, 108 English Reports (full reprint), 1075, the King's Bench Division had before it the question as to whether or not the Commissioners of Sewers were liable for damages because they erected certain defenses against the inroads of the sea, which caused it to flow with greater violence against, and therefore

with injurious effects to the lands of an adjacent owner. The court held that, even though the injury may have been done by the construction, it was injury without damage. In the course of his opinion Lord Tenterden referred to the *sea* as a *common enemy*. In part he said:

"But it is contended that this new groyne has caused the sea to flow with greater violence against the land of Mr. Cosens, and make a greater inroad upon it, than possibly it might otherwise have done; and that as the commissioners, acting for the benefit of the level, have occasioned this damage, they must make compensation for it. It may be conceived that such is the effect of the groyne; but the sea is a common enemy," etc.

We have concluded, as have others, upon investigation, that Lord Tenterden's actual application of the common enemy doctrine *was to the sea, and not to surface waters,* and that the New Jersey Supreme Court erroneously stated that the application was to the latter. Farnham on Waters, vol. 3, p. 2596; see also Coulson & Forbes Law of Waters, p. 46.

The only authority cited in the Durkes Case in support of the rule there followed as to surface waters was Bowlsby v. Speer, 2 Vroom (N. J.), 351, 86 Am. Dec., 216. This case, in turn, cited as its authority for the conclusion that the *common enemy doctrine* was the rule of the common law of England the English cases cited below, certain Massachusetts cases, and one New Jersey case. The English cases named do not in the remotest degree support the conclusion that the common enemy doctrine was applicable to surface waters. We have read the cases, and all that was decided in them was that the owner of lands upon which surface water gathered might divert and use the surface water for his own purposes without actionable injury to the adjacent land owner who had theretofore received the flow of the surface water and desired to make continued use of it. Greatrex v. Hayward, 22 L. J. R. (New Series) Exchequer, p. 137; Rawstrom v. Taylor, 22 L. J. R. (New Series) Exchequer, p. 33; Broadbent v. Rawsbotham, 22 L. J. R. (New Series) Exchequer, p. 115; Coulson & Forbes Law of Waters, p. 201; Jones on Easements, p. 607, sec. 759; Washburn on Easements and Servitudes (4th ed.), p. 501, sec. 8, p. 502, sec. 9; 23 American Law Review (1889), p. 387. In the publication last cited an article by Mr. J. C. Thomson on surface waters supports what has been stated above. The writer in part says:

"The courts, which have adopted the so-called common-law rule, have applied to surface waters the remark of Lord Tenter-

den that water is a common enemy against which each proprietor must defend himself. This remark, however, was not applied to surface waters, and can constitute no authority for the common-law rule.

\* \* \* \* \*

"The cases of Chasemore v. Richards, Acton v. Blundell, Rawstrom v. Taylor, and Broadbent v. Rowbotham, are the leading England cases upon the law of surface waters, but they are all cases where the plaintiff complained of the act of the defendant in appropriating the water, and contain nothing either by way of inference or *dicta obiter* which can be construed as authority for the proposition that the lower proprietor is at liberty to reject the surface waters if he so pleases.

\* \* \* \* \*

"In view of the fact that there is not, and never has been, any law in English which will support the Massachusetts doctrine, it is difficult to see how it can be justified, and certainly it can have no claim to the name so commonly applied to it."

We regard it as conclusive that the so-called common enemy doctrine originated in Massachusetts, and upon an erroneous assumption that Lord Tenterden had made the rule applicable to surface waters, the New Jersey courts adopted it as that of the common law and gave name to it in American jurisprudence. Farnham on Waters, vol. 3, sec. 889c; 27 Ruling Case Law, pp. 1144, 1145, sec. 74; see also annotations 22 L. R. A. (N. S.), p. 790; 20 L. R. A. (N. S.), pp. 155, 156; 43 L. R. A. (N. S.), 792; California Law Review, vol. 8, p. 198. In the publication last cited the writer, after an exhaustive investigation, says:

"What the courts characterize as the common law rule may be said not to be common law at all; at least the English courts never laid down such a principle in the law of surface waters. This so-called common law rule is a certain anomalous doctrine, recognized as to surface waters in but a few states, and often called the 'common enemy' rule. Where it sprang from no one seems to know. Castro v. Bailey cites only two cases, both from Massachusetts, but neither was a case of surface waters. The term 'common enemy' evidently comes from the English case of Rex v. Pagham, involving the rights of owners of lands along the ocean to protect themselves against the ravages of the sea."

To say that the surface waters having their source in precipitation, snow, and rain, and passing in a diffused state over

the surface of the earth, are a *"common enemy,"* comparable to the constant ravages of the sea against its shore line, would tax the credulity of a child. As to the destructive work of the sea, the waves of which sometimes move with a velocity of sixty miles per hour, and strike the shore with a force of from 600 to more than 2,000 pounds per square foot, see generally Cleland's Geology, chap. 6; "Physiography," by Tarr and Martin, chaps. 11, 21; Grabau's Geology, vol. 1, p. 427. The scientific fact is that surface waters are the source of all life on this planet, as essential to its continuance as light, air, and soil. Moreover, these waters flowing in their natural diffused state over the earth's surface, are gentle in their movements, passing into and becoming a part of the soil, carrying and distributing organic matter for the enrichment in turn of the estates over which they flow, and furnishing the source of supply of all ground water from which wells, springs, streams, and rivers draw their sustenance. Except as surface water *run-off* may mark the beginning of river formation, it is not to be classed as a primary destructional agency of the hydrosphere, although, of course, all land denudation has its origin in precipitation. Graham's Geology, vol. 1, p. 410, and other authorities supra. The New Jersey court, in saying that such surface waters were a *"common enemy,"* spoke not only without any judicial support, but without any support in nature itself.

The so-called "common law rule" or "common enemy doctrine" is correctly stated by a leading authority as follows:

"According to what is known as the 'common law rule,' or 'common enemy doctrine,' adopted by the courts of some jurisdictions, no natural easement or servitude exists in favor of the superior or higher land as to mere surface water, or such as falls or accumulates by rains or the melting of snow; and the proprietor of the inferior or lower tenement or estate may at his option lawfully obstruct or hinder the flow of such water thereon, and in so doing may turn back or off of his own lands, and onto and over the lands of other proprietors, such waters, without liability by reason of such obstruction or diversion." 27 R. C. L., p. 1143, sec. 74.

It is apparent that this rule is one of force, rather than of common justice. As Mr. Farnham says:

"Such a rule must of necessity lead to a breach of the peace, and is against the policy of the law. If one man has a right to drain water upon his neighbor, and the latter has a right to dam it back, the question of which will be successful depends

merely upon which is the stronger; and such a rule can never be admitted." Farnham on Waters, vol. 3, sec. 889c, p. 2595.

This rule in its application became so unjust and oppressive that courts which originally announced adherence to it have very generally qualified it until its original interidments have been largely nullified, and as applied, it now differs but little, if at all, from the civil law rule. 27 R. C. L., p. 1145, sec. 75. The "common enemy doctrine," however, was adopted by this court in 1889 in the case of Gross v. City of Lampasas, 74 Texas, 195, and reaffirmed in the case of Barnett v. Matagorda Rice & Irrigation Co., 98 Texas, 355, 83 S. W., 801. These cases, however, may have been correctly decided, even under the civil law, without regard to the common enemy rule. Hall's Mexican Laws, p. 404, sec. 1375; 20 California Jurisprudence, secs. 498, 501; 8 California Law Review, 197; 27 R. C. L., p. 1149, sec. 78; Coombs v. Reynolds, 43 Cal. App., 656, 185 Pac., 877; Martin v. Jett, 12 La., 501, 32 Am. Dec., 120; Livingston v. McDonald, 21 Ia., 160, 89 Am. Dec., 563; Kinney on Irr. & Water Rights (2d ed.), vol. 1, sec. 560.

Regardless, however, of the question as to whether or not these two cases may not have been properly decided, even under the Mexican civil law rule, the fact is that they adopted the "common enemy doctrine" under the mistaken view that it was the common law rule, and established and made that the rule in this State, in so far as the Court had power to do so. However, in the Barnett case the Court limited its effect by declaring that the servient owner "must not exceed a due exercise of dominion over his own soil." These cases were followed by the Courts of Civil Appeals, until the enactment of the law of 1915. Booker v. McBride, 16 Texas Civ. App., 348, 40 S. W., 1031; Gembler v. Echterhoff, 57 S. W., 313 (writ refused); Gramann v. Eicholtz, 36 Texas Civ. App., 309, 81 S. W., 756; Barstow Irrigation Co. v. Black, 39 Texas Civ. App., 80, 86 S. W., 1036 (writ refused); Batla v. Goodell, 53 Texas Civ. App., 178, 115 S. W., 622; Simon v. Nance, 142 S. W., 661; Wilborn v. Terry, 161 S. W., 33 (writ refused); Cartwright v. Warren, 177 S. W., 197; Wellborn v. Wellborn, 185 S. W,. 1041; Walenta v. Wolter, 186 S. W., 873 (writ refused by Committee of Judges); Gaertner v. Stolle, 238 S. W., 252 (writ refused). A reading of some of these cases plainly indicates a decided departure from the strict rule of the "common enemy doctrine."

The foregoing history of the subject of surface water rights not only shows the confusion and injustice engendered by the adoption of the "common enemy doctrine," which in fact had

no foundation under the common law, but it shows plainly that the rule was incapable of universal application in this State, since much of our land had been granted under the civil law with vested rights incident thereto; and all railway improvements since 1876 had been made under the statutory adoption of that rule.

■■ The situation thus outlined clearly presented a field for legislative action under the police power, and we think the Legislature had the constitutional power to enact the measure before us. As to grants of land made under the civil law, the act was not intended to make any material change, for the reason that the statute is clearly based upon the civil law conception of surface water rights. As to lands granted since 1840, the proprietors had no vested right in the rule of decision prescribed by the adoption of the common law. No easement or servitude of any character was created or intended by the so-called "common law rule." It merely permitted the respective owners of contiguous estates to use their own property in a certain way, for which we said under the common law no cause of action existed, even though injury might be done to the adjacent properties. The act of 1915 changed the rule and gave a cause of action where the owner of one estate so used his property as to injure an adjacent tenement. It is elementary that the rules of the common law governing the use of property may be changed and a cause of action prescribed where none existed before, or statutory actions and remedies in some instances may be substituted for previously existing rights and remedies under the common law. Chicago & Alton R. R. Co. v. Tranbarger, 238 U. S., 67; Gray v. Reclamation District, 174 Calif., 622, 163 Pac., 1024, 1036; Munn v. Illinois, 94 U. S., 113, 134.

That the act before us is valid, we think definitely settled by the authorities. Tranbarger v. Chicago & Alton R. R. Co., 250 Mo., 46, 156 S. W., 694; Chicago & Alton R. R. Co. v. Tranbarger, supra, and authorities cited.

The case just cited is from the State of Missouri, which at an early date adopted the common law as the rule of decision. In applying this rule the Supreme Court of that State followed the "common enemy doctrine" as the rule of the common law, as was done in Texas. Shalk v. Inter-River Drainage District, 226 S. W., 277. The roadbed of the railroad company was lawfully constructed prior to the enactment of any statute requiring opening therein for the passage of surface waters. Subsequently the Legislature passed an act requiring such openings

to be made, and making railroad companies liable in damages for failure to comply therewith. The Supreme Courts of both the State of Missouri and the United States sustained the validity of the act. In passing upon the constitutional questions involved, the Supreme Court of the United States, in an opinion by Mr. Justice Pitney, in part said:

"It is upon the clause added in 1907 that the present action is founded, and upon that clause the questions before us are raised. It is attacked as an *ex post facto* law, as a law impairing the obligation of the contract between the State and the Railroad Company, and as repugnant to the 'due process' and 'equal protection' provisions of the Fourteenth Amendment.

"The argument that in respect of its penalty feature the statute is invalid as *an ex post facto* law is sufficiently answered by pointing out that plaintiff in error is subjected to a penalty not because of the manner in which it originaly constructed its railroad embankment, nor for anything else done or omitted before the passage of the act of 1907, but because after that time it maintained the embankment in a manner prohibited by that act.

\*   \*   \*   \*   \*

"Next, it is insisted that for all purposes except those covered by the act of 1907, Missouri has at all times adhered to the common-law rule that surface water is a common enemy, against which every landowner may protect himself as best he can, and that this applies to and protects railroads as well as other landowners. Abbott v. Kansas City & C. Ry. (1884), 83 Missouri, 271, 280 et seq.; Jones v. St. Louis &c. Ry., 84 Missouri, 151, 155; Schneider v. Missouri Pacific Ry., 29 Mo. App., 68, 72; Ready v. Missouri Pacific Ry., 98 Mo. App., 467. The conclusion sought to be drawn is that the common-law rule, as it existed at the time the railroad was built and the right of way acquired, entered into the contract between the State and the Company, and into the contracts between the Company and the landowners from whom its right of way was acquired, and that the immunity from prosecution and from private action alike was in the nature of an appurtenance to the land, the enjoyment of which could not be impaired by subsequent legislation.

\*   \*   \*   \*   \*

"The previous immunity from responsibility for such injury was nothing more than a general rule of law, which was not in terms or by necessary intendment imported into the contract. For just as no person has a vested right in any general rule of law or policy of legislation entitling him to insist that it shall

remain unchanged for his benefit (Munn v. Illinois, 94 U. S., 113, 134; Hurtado v. California, 110 U. S., 516, 532; Buttfield v. Stranahan, 192 U. S., 470, 493; Martin v. Pittsburg &c. R. R., 203 U. S., 284, 294), so an immunity from a change of the general rules of law will not ordinarily be implied as an unexpressed term of an express contract. See Gross v. United States Mortgage Co., 108 U.. S., 477, 488; Pennsylvania R. R. v. Miller, 132 U. S., 75, 83."

In discussing the police power as a basis of the legislation, Mr. Justice Pitney continued:

"But a more satisfactory answer to the argument under the contract clause, and one which at the same time refutes the contention of plaintiff in error under the due process clause, is that the statute in question was passed under the police power of the State for the general benefit of the community at large and for the purpose of preventing unnecessary and wide-spread injury to property.

"It is established by repeated decisions of this court that neither of these provisions of the Federal Constitution has the effect of overriding the power of the State to establish all regulations reasonably necessary to secure the health, safety, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise. Atlantic Coast Line v. Goldsboro, 232 U. S., 548, 558, and cases cited. And it is also settled that the police power embraces regulations designed to promote the public convenience or the general welfare and prosperity, as well as those in the interest of the public health, morals, or safety. Lake Shore & Mich. Southern Ry. v. Ohio, 173 U. S., 285, 292; C., B. & Q. Ry. v. Drainage Commissioners, 200 U. S., 561, 592; Bacon v. Walker, 204 U. S., 311, 317.

"We deem it very clear that the act under consideration is a legitimate exercise of the police power, and not in any proper sense a taking of the property of plaintiff in error. The case is not at all analogous to those which have held that the taking of a right of way across one's land for a drainage ditch, where no water-course exists, is a taking of property within the meaning of the Constitution. The present regulation is for the prevention of damage attributable to the railroad embankment itself, and amounts merely to an application of the maxim *sic utere tuo ut alienum non laedas.*"

The Supreme Court of Missouri, as stated above, held the

act valid under the police power. After having referred to the source of this power, that court in part declared:

"The only restrictions upon the exercise of this faculty are that its use shall be reasonably adapted to the ends for which it is given, and that it shall not infringe any right or privilege guaranteed by the Federal Constitution. The authorities and cases demonstrating these principles are uniform. * * *

"The statute sued upon was enacted to prevent the property of citizens owning lands traversed by railroads from being injured by the construction or maintenance of an embankment which would obstruct the flow of water and cause it to flood the farming land and destroy its crops. It was therefore an exertion of a police power of the inalienable class, and whether it affected the rights which appellant claimed from its lessor is wholly immaterial to the validity of the Act.

"We hold that this statute is impregnable to assault from the standpoint of the assumed vested right of the appellant to continue the maintenance and operation of its railroad contrary to its provisions. It did not destroy any vested right of appellant to maintain a solid embankment with no apertures therein for the passage of water thereby injuring the property of others, for it had no such right, regardless of the character of contract between the state and its lessor or of the growth of prescription, and could not have been vested with such right without taking from the state its essential functions as a sovereign power for the purposes defined in our Constitution."

█ The act in question in this case, as in the Tranbarger case, does not take the previously constructed ditch and levees of plaintiffs in error, nor require their destruction. It merely prevents the plaintiffs in error from so using them as to injure the defendants in error. They may still be used for any lawful purpose. Nor does the act have a retrospective effect in so far as that which may have been done previous to its passage may be concerned. It acts only upon the prospective acts of the plaintiffs in error in continuing the use of the ditch and levees in such manner as may result in damage and injury to their neighbors. It appears to us that the Tranbarger case covers all the constitutional questions here involved, and renders any further discussion unnecessary.

In the case of Wilkerson v. Garrett, 229 S. W., 666 (writ refused), the validity of the Act of 1915 was raised, but was not passed on by the Court of Civil Appeals.

In Gaertner v. Stolle, 238 S. W., 252 (writ refused) the constitutional question was raised, but the jury found that the

flow of surface water had not been diverted, and so the validity of the act was not material to a correct disposition of the case. However, in so far as the opinion in that case may be in conflict with the decision in the instant case, it is overruled.

The Court of Civil Appeals in North Texas Compress & Warehouse Co. v. Howard, 267 S. W., 1026, approved the holding in the Gaertner case, and our disapproval of the latter case applied to the Howard case also. Nor do we agree with the interpretation and construction of the law before us made in the Howard case.

The word "overflow" is, of course, capable of the meaning attributed to it by the Court of Civil Appeals,—that is, "to flow over the bounds, over the brim"; but its meaning also is, "to flow over; to cover with or as with water or other fluid; to spread over, to inundate." Webster's New International Dictionary. Giving the word the meaning just quoted from the dictionary, it is apparent when one wrongfully diverts surface water and causes it to flow over another's land, causing damage, his acts are within the prohibitory terms of the statute, and a cause of action arises.

The interpretation which we give this statute is one entirely consistent with all the language employed, and gives a rule which may be applied to all lands of the state, whether granted under the civil or under the common law.

■ We are of the opinion that the Act of 1915, R. S., art. 7589a, Vernon's Sayles', is valid and effective to prevent the diversion of surface waters from the lands of plaintiffs in error on to those of defendants in error, in such a manner as to cause destruction or damage.

In addition to what has been said, it is obvious from an examination of the map that the plaintiffs in error, if permitted to go forward with their constructions, would capture the surface water flowing on their own land, which would otherwise pass into the lake shown on the map, or would pass between the point "C" on the map and the Letzerich land in a diffused state, and by concentrating it in the ditch and along the levee cause it to pass off on to the lands of the defendants in error in increased quantities, in a different state and in a manner well calculated to inflict injury. This being so, their acts are prohibited, not only by the civil law and the statute under examination, but are condemned with equal emphasis by the so-called "common law rule" or "common enemy doctrine." 27 R. C. L., pp. 1151, 1153, sec. 79; Higgins v. Spear, 118 Texas, 310, 15 S. W. (2d) 1010; Gembler v. Echterhoff, 57 S. W., 313;

Wilkerson v. Garrett, 229 S. W., 666; Gulf, C. & S. F. Ry. Co. v. Donaho, 59 Texas, 128; White v. Chapin, 12 Allen (Mass.), 516; Farnham on Water Rights, vol. 3, secs. 887, 891, and cases cited in the notes.

The judgment of the district court was as favorable to the plaintiffs in error as they could have expected, and the judgment of the Court of Civil Appeals, affirming that of the district court, was a correct disposition of the case. The judgments of the district court and Court of Civil Appeals are both affirmed.