Karl E. KRAFT, Petitioner,

v.

Ivan LANGFORD et al., Respondents.

No. B–7019.

Supreme Court of Texas.

April 5, 1978.

Rehearing Denied May 10, 1978.

McClain, Harrell & McClain, W. C. McClain, Conroe, Karl E. Kraft, Houston, for petitioner.

Sears & Burns, C. Charles Dippel, Fred A. Collins, Houston, for respondents.

STEAKLEY, Justice.

This suit was instituted by Karl E. Kraft in Montgomery County against Downing & Wooten Enterprises, Inc., and Ivan Langford. It is described by Kraft in his Application for Writ of Error as a suit "to recover from Respondents [Downing & Wooten and Langford], jointly and severally, for damages to land caused by the intentional

diversion of surface waters in violation of Section 5.086 of the Texas Water Code . . . and to enjoin the continuance of such diversion." An initial and somewhat detailed statement of the factual background will bring into focus the rulings of the courts below, 551 S.W.2d 392, and the controlling issues under the present record.

Kraft is the owner of a 21.27 acre tract of land in Montgomery County on which he resides. Downing & Wooten, to which we will sometimes refer as "the Developer," is a land development corporation and the owner of a 50 acre tract of land lying generally to the north and west of Kraft's tract and bordering on its western boundary. A portion of the Developers' land, referred to as the "panhandle," extends eastward over the northern boundary of the Kraft land, but is separated from it by the property of others. The principal actors in the development corporation are Lloyd Downing and Foster Wooten. Downing & Wooten developed its tract into what is named the Vicksburg subdivision. Langford was the design and supervisory engineer for the subdivision and, among other things, designed the storm sewer system. Prior to the construction of the subdivision, a small drainage channel or drainway lay upon the two tracts in question. This drainway was a natural feature of the land and originated on the Vicksburg tract from whence it meandered generally south and east across the Vicksburg land and across the Kraft land before discharging into the Panther Branch waterway. The drainway did not have a continuous flow of water and served only to drain excess rainwater from the land. The storm sewer system designed by Langford and subsequently constructed drained the entire Vicksburg tract into an underground pipe which generally followed the course of the natural drainway and discharged the collected water onto Kraft's land at the point at which the natural drainway had entered his land.

Langford and the Developers did not have a written contract detailing the obligations and duties of Langford as the engineer on the project. Langford testified that he was hired to serve only as a consult-ing engineer. Downing and Wooten testified that Langford's duties were to handle all phases of the design and construction of the drainage system, engineering and otherwise. It was established that Langford initially determined that the drainage system he was designing would drain more of the Vicksburg land into the drainway before it entered Kraft's land than had naturally drained into it, but that he did not inform his client of this fact. There was also evidence that Langford assumed the responsibility of attempting to secure Kraft's permission to clear the drainway on his property in order to facilitate the increased drainage from the Vicksburg tract. It was undisputed that Kraft refused to give his permission and that he cautioned Langford not to discharge more water onto his land than was normal. It was Langford's further testimony that it would normally have been his practice to communicate this information to his clients but that he did not recall having done so. The Developers, on the other hand, testified that he did not tell them of Kraft's refusal. It was also undisputed that Kraft sent a letter to Langford complaining of a discharge of excessive amounts of water and directing him to take action to cease the practice. A copy of this letter was also sent to the Developers. One of the Developers, Wooten, testified that this letter was the first knowledge that the corporation had of a problem concerning Kraft and that he did not read the entire letter but turned it over to Langford to handle. It was also undisputed that Langford then wrote a letter on his own stationery and over his signature in which he suggested that Kraft, at his convenience, meet with the Developers and "their engineers" to discuss the problem. This appears not to have transpired.

This is the second appeal. The first appeal was from a judgment of the trial court granting Kraft a temporary injunction against the diversion, and overruling Langford's plea of privilege to be sued in Harris County. This judgment was affirmed by the Court of Civil Appeals, *Langford v. Kraft,* 498 S.W.2d 42 (Tex.Civ.App.1973).

Downing & Wooten and Langford each applied for writ of error. We let stand the temporary injunction by refusing Downing & Wooten's Application for Writ of Error as to it with the notation "no reversible error." We did not have jurisdiction of Langford's Application for Writ of Error from the judgment overruling his plea of privilege and his application was dismissed for want of jurisdiction. So in this first appeal, we were concerned only with the judgment of the trial court temporarily enjoining the diversion.

The current appeal is from the judgment of the trial court after trial to a jury on the merits. The jury found that the entire Vicksburg tract had not drained onto the Kraft land prior to the construction of the drainage system; that the discharge of water from the improvements was more than the natural capacity of the drainway; that the overflow did not result from an act of God; that both the Developers and Langford diverted the natural flow of water from Vicksburg onto the land of Kraft; that the Developers allowed the diversion to continue after being notified of it; that the diversion was the proximate cause of permanent damage to the Kraft tract; that the permanent damage to the Kraft tract for the period between April, 1972, and October, 1975, was $38,991.10; that both Langford and the Developers acted willfully, wantonly, or wrongfully in diverting the flow of the waters; and that exemplary damages should be awarded against the Developers and Langford jointly in the amount of $102,000.00.

Based on the jury findings, the trial court rendered a joint and several judgment for Kraft against Downing & Wooten and Langford (1) awarding Kraft actual damages in the amount of $38,991.10; (2) awarding Kraft exemplary damages in the amount of $100,000.00;[1] and (3) permanently enjoining Downing & Wooten from discharging water upon Kraft's tract of

land from the drainage system. Upon appeal, the Court of Civil Appeals reversed this judgment and generally remanded the cause to the trial court. 551 S.W.2d 392. Kraft and Langford filed separate Applications for Writ of Error from this judgment and each was granted.

There are three controlling questions to be resolved. The first is whether the Court of Civil Appeals correctly reversed the judgment of the trial court because of error in submission of the damage issue. The second is whether Langford as a third party owning no interest in the Vicksburg tract is subject to the statutory cause of action asserted against him by Kraft under the provisions of Section 5.086 of the Texas Water Code.[2] The third question is whether as a matter of law under this record Langford is immune from any liability to Kraft and thus entitled to a rendition of judgment in his favor.

We agree with the ruling of the Court of Civil Appeals that there was reversible error in the manner of submission of the damage issue. We hold further that Langford is not subject to the statutory cause of action provided by Section 5.086 of the Texas Water Code but that his immunity from liability under any other theory is not established as a matter of law. We therefore affirm the judgment of the Court of Civil Appeals generally remanding the cause to the trial court.

I.

THE KRAFT APPLICATION FOR WRIT

The award of actual damages in favor of Kraft is based entirely on the jury response to Special Issue No. 8, which read as follows:

"SPECIAL ISSUE NO. 8

What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Karl E. Kraft for the

---

1. In his motion for judgment on the verdict, Kraft filed a remittitur of $2,000.00 as to the award of exemplary damages in that it exceeded the amount for which he had prayed. The

judgment reflects the award less the amount remitted.

2. All references are to Tex.Rev.Civ.Stat.Ann.

permanent damage, if any, to his 21.27-acre tract of land proximately caused by the diversion of surface water, if any, from Vicksburg Subdivision onto Plaintiff's tract between April 1, 1972, and October 27, 1975, but not thereafter?" The answer given by the jury, $38,991.10, was the exact sum given by an expert witness for Kraft as the amount his land had diminished in value because of the drainage system. The charge of the court defined the terms "permanent damage" and "market value"; however, the latter term was not included in the special issue. The question before us is whether this issue, which was submitted over the objections of Langford and the Developers, properly stated the applicable measure of damages. The Court of Civil Appeals held that it did not and we agree.

■ The type of compensation to be awarded for an injury to real property is not invariable, but will depend upon the nature of the injury. See, *Atlas Chemical Industries, Inc. v. Anderson*, 524 S.W.2d 681 (Tex.1975); see, generally, 25 C.J.S. *Damages* § 84 (1966). Permanent injuries give rise to a cause of action for permanent damages, normally measured as the difference in the value of the property before and after the injury. See, *e. g., Fort Worth & D. C. Ry. Co. v. Hogsett*, 67 Tex. 685, 4 S.W. 365 (1887). Temporary injuries, on the other hand, give rise to a cause of action for temporary damages, the proper measure of which is the amount of "damages which have accrued during the continuance of the injury covered by the period for which the action is brought." *Lone Star Gas Co. v. Hutton*, 58 S.W.2d 19, 21 (Tex.Comm.App. 1933, holding approved). Stated differently, the proper measure of damages for a temporary injury to real property is the amount necessary to place the owner of the property in the same position he occupied prior to the injury.

■ The character of an injury as either permanent or temporary is determined by its continuum. Permanent injuries are those which are constant and continuous, not intermittent or recurrent. *Atlas Chem-*

*ical Industries, Inc. v. Anderson, supra.* Temporary injuries are those which are not continuous but are "sporadic and contingent upon some irregular force such as rain." *Id.* Another characteristic of a temporary injury is the ability of a court of equity to enjoin the injury causing activity. An injury which can be terminated cannot be a permanent injury. The concepts of temporary and permanent injuries are mutually exclusive and damages for both may not be recovered in the same action. *Lone Star Gas Co. v. Hutton, supra,* at 21.

■ The injuries alleged by Kraft in the present case possess only the characteristics of temporary injury and none of the characteristics of permanent harm. The flow of water through the storm drainage system depends upon the fortuitous event of rain and is not continuous. Further, Kraft has prayed for and received injunctive relief as well as "permanent damages." While it is permissible to plead for alternative relief in a case such as this, the applicable rule has been well stated by Professor Dobbs:

Actually, a great deal of the problem would be solved or avoided if plaintiffs in all these suits recognized the merger of law and equity and sought injunctions as well as damages. If the injunction issues to forbid further invasion, that fact alone will normally establish that the invasion is temporary rather than permanent and damages can thus be appropriately limited. On the other hand, if the injunction is denied, or if it proves unenforceable, and if the condition or operation meets the test of physical permanency, permanent damages can be awarded appropriately, since denial of the injunction assures "legal permanency."

D. Dobbs, Handbook on the Law of Remedies, § 5.4 at 342–3 (1973). The injury here alleged and established was altogether of a temporary nature and, as held by the Court of Civil Appeals, the trial court erred in submitting the issue on permanent damages over the objection of Langford and the Developers.

## II.

### THE LANGFORD APPLICATION FOR WRIT

As stated in Kraft's Application for Writ of Error, quoted earlier, Kraft in his suit against Langford, both in pleading and jury submission, sought to invoke a cause of action under Section 5.086 of the Texas Water Code. This section provides, in part, as follows:

(a) No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded.

(b) A person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow.

．　　．　　．　　．　　．

The threshold problem is whether this statute gives Kraft a cause of action against Langford, who is a third party and owns no interest in the tract of land composing the Vicksburg subdivision.

 Section 5.086 is the codification of a statute which dates back to the various sovereigns of Texas and the land grants made during their tenures. Chief Justice Cureton traced this history in *Miller v. Letzerich*, 121 Tex. 248, 49 S.W.2d 404, 85 A.L.R. 451 (1932), and his comprehensive analysis will not be repeated here. Suffice to note that, absent a statute governing the rights of land holders, those owners whose title derives from Spanish or Mexican land grants are governed by the civil law, whereas those whose title derives from subsequent grants are governed by the common law. See, *Miller v. Letzerich, supra.* See also, *State v. Valmont Plantations*, 346 S.W.2d 853 (Tex.Civ.App.1961), aff'd, 163

Tex. 381, 355 S.W.2d 502 (adopting opinion of the Court of Civil Appeals). The distinction between the two legal systems is significant in the field of surface water because different property rights were secured under them. Under the civil law rule a landowner could not burden adjacent lands with surface water he accumulated or discharged except in the same manner in which it would naturally flow. *Miller v. Letzerich, supra.* See also, Kinyon & McClure, *Interferences With Surface Waters*, 24 Minn.L.Rev. 891 (1940) (hereinafter cited as Kinyon & McClure); W. Hutchins, The Texas Law of Water Rights, ch. 14 at 515 (1961) (hereinafter cited as Hutchins); Bouldin, *Rights in Diffused Surface Water in Texas*, Water Law Conference, (U. of Tex., 1952–1956) 1955 at 5 (1956). The effect of the civil law rule was to impose a natural easement on the land of those adjacent to a surface water owner. The extent of the easement ran only to the natural flow of surface water, however, and the servient estate was under no obligation to receive a different flow or greater quantities of water than would be natural. *Miller v. Letzerich, supra.*

 The rule at common law is not easily susceptible to general statement. It appears that the true rule pertaining to surface waters was the same under the common law as under the civil law; but it also appears that another doctrine, the so-called "common enemy rule,"[3] has often been erroneously identified as the common law rule. See, Hutchins, *supra*, at 526–33; Kinyon & McClure, *supra*, at 899; National Water Commission, A Summary-Digest of State Water Laws, § 3.7 (1973); *Miller v. Letzerich, supra*; 93 C.J.S. *Waters* § 114 (1956); 78 Am.Jur.2d *Waters* § 120 (1975). The "common enemy rule" was adopted by this Court in 1889 under the mistaken view that it was the common law rule. *Gross v. Lampasas*, 74 Tex. 195, 11 S.W. 1086 (1889). See also, *Miller v. Letzerich, supra.*

---

**3.** Under the "common enemy rule," water is seen as the natural enemy of all property holders and each proprietor is free to fend it off without regard for the rights of the surrounding landowners. No natural easements existed

and every landowner had the right to burden his neighbor's land with the overflow of surface water created by his acts of diversion or impoundment. See *Miller v. Letzerich, supra.*

■ The status of the law, then, after *Gross* was that the civil law rule as to surface water applied to lands granted by the governments of Spain and Mexico; while the common enemy doctrine was applicable to the lands granted by the Republic of Texas and the State of Texas. This difference in the law was eliminated by the Legislature in 1915, when it enacted Article 7589a, the predecessor statute to Section 5.086.[4] The effect of the statute was twofold. It first prescribed that the civil law rule as to surface water would henceforth govern all property. In doing so, the statute created property rights for those landowners taking under grants made subject to the common law and thereby recognized the civil law rule of "natural easements." The second effect of the statute was to create a statutory cause of action in favor of property owners whose property has been injured by an overflow of surface waters caused by the diversion or impounding of their natural flow. The statute does not purport to establish an exclusive remedy and that which it provides is additional to the common law remedies for interferences with interests in real property. The elements of the statutory cause of action are (1) a diversion or impoundment of surface water which (2) causes (3) damage to the property of the plaintiff landowner. See, Hutchins, *supra*, at 532 and cases cited therein. The statute is a rule of property that defines and limits the rights of property owners. As a rule of property which creates easements and limits their use, the statute has no application to persons or entities who are not proprietors of land. As noted by Chief Justice Cureton in *Miller*, *supra*, "The act of 1915 changed the rule and gave a cause of action *where the owner of one estate* [Italics added] so used his property as to injure an adjacent tenement." Accordingly, a party injured by an excess overflow of surface water caused by the acts of a third party, whether or not acting for or with the knowledge and consent of the other, must, as to the third party, look to the common law for remedy.

■ The final question is whether, as asserted by Langford, his status as a professional engineer precludes Kraft from any other remedy against him as a matter of law. We hold that it does not and the general remand ordered by the Court of Civil Appeals is therefore affirmed.

We alluded earlier to the first appeal in this case where, in resolving questions of venue, the Court of Civil Appeals ruled that in designing the drainage system Langford violated Section 5.086 and that "the servitude—the right to cast the excess waters upon Kraft not having been acquired by his principals—he must bear his portion of the damages caused by the joint acts of the parties." *Langford v. Kraft*, 498 S.W.2d at 52. We did not have jurisdiction to entertain an appeal from this determination of the Court of Civil Appeals and the question remained open in this Court. We have now decided this question contrary to the decision of the Court of Civil Appeals in the

4. This statute, first enacted in 1915, was omitted from the Revised Statutes of 1925 and was therefore repealed. It was reenacted in 1927 in almost identical terms before being codified in Section 5.086. The 1927 statute was as follows:

That it shall hereafter be unlawful for any person, firm or private corporation to divert the natural flow of the surface waters in this State or to permit a diversion thereof caused by him to continue after the passage of this Act, or to impound such waters, or to permit the impounding thereof caused by him to continue after the passage of this Act, in such a manner as to damage the property of another, by the overflow of said water so diverted or impounded, and that in all such cases the injured party shall have remedies, both at law and in equity, including damages occasioned thereby, provided that the passage of this Act shall in no way affect the construction and maintenance of levees and other improvements for the purpose of controlling floods, overflows and freshets in rivers, creeks and streams, nor the construction of canals for conveying waters for irrigation or other purposes; and provided further that nothing in this Act shall be so construed as to authorize or give authority to persons or private corporations owning or constructing canals for irrigation or other purposes to construct or maintain any canal, lateral canal or ditch in such manner as to obstruct any river, creek, bayou, gully, slough, ditch or other well defined natural drainage.
1927 Tex.Gen.Laws, Ch. 56 at 80.

venue appeal. It is manifest, however, that Kraft had good reason until now to continue his statutory suit against Langford. In the earlier part of this opinion we reviewed briefly the relationship between the Developers and Langford, together with the activities of Langford in his design and supervision of the construction of the drainage system. The evidence is conflicting in many respects. This can be resolved upon the remand of the case to the trial court where Kraft will have opportunity to pursue such remedies as he may now invoke to redress the injury to his property.

The judgment of the Court of Civil Appeals is affirmed.