**STATE et al. v. SUN OIL CO. et al.**

**No. 8481.**

Court of Civil Appeals of Texas. Austin.

Feb. 2, 1938.

On Rehearing March 9, 1938.

Wm. McCraw, Atty. Gen., and H. Grady Chandler and Russell Renfro, Asst. Attys. Gen., for the State.

Kayser, Liddell, Benbow & Butler, of Houston, and Henry Brooks, Polk Shelton, Gaynor Kendall, and Homer C. De-Wolfe, all of Austin, for all other appellants.

W. N. Foster, of Conroe, Ben H. Powell and James H. Hart, both of Austin, and T. L. Foster, of Dallas, Llewellyn & Dougherty, of Liberty, Foster & Williams, of Conroe, James Marberry, of Austin, and J. W. Timmins, of Dallas, for appellees.

BAUGH, Justice.

This is a vacancy suit. The land involved is in the Conroe oil field in Montgomery county. The State sued numerous parties to recover 331 acres as unsurveyed public domain belonging to the public free schools. Trial was to a jury, but at the close of the evidence the trial court instructed a verdict for the defendants, and rendered judgment accordingly; from

which the State, and cross-plaintiffs, who asserted priority of rights to a mineral lease on the lands, have appealed.

The ultimate issue in the case depends upon the proper location on the ground of the John Bricker and R. G. Hamlett surveys in said county. If located as contended for by the State, the vacancy exists; if located as urged by the defendants, there is no vacancy. Reference to the attached map will aid in a better presentation of the issues raised:

Bricker surveys. The field notes filed in the General Land Office show the following: Those of the Bricker survey were certified by John M. Wade, as deputy surveyor, under a certificate dated February 28, 1839, as having been made since August 1, 1838, and approved as correct by the county surveyor of Montgomery county, on April 16, 1839. It is not shown just when they were filed in the General Land Office. Patent to the land was issued on August 11, 1845. These field notes called

The State's contention is that the vacancy exists between the east lines of the Bricker and Hamlett surveys and the west lines of the T. & N. O. R. R. Company surveys 3 and 4.

The original surveys of the Harris, Henderson, Bricker, and Hamlett (originally surveyed for Murphy) were made in 1838. The West San Jacinto River formed the west boundary of the Harris and Henderson surveys. The south line of the Alfonso Steele, obviously a senior survey, formed the north lines of the Harris and

to begin on the south line of the Steele survey 2,790 varas (there is a contention by the State that this distance was 2,290 varas in the original field notes, which will be considered later) from the S. W. corner of the Steele as the beginning corner of the Bricker; thence N. 60 E. with the south line of the Steele 1,900.8 varas; thence southeast, southwest, and back northwest on a random line to the beginning. Each corner was located by marked bearing trees, but no other survey than the Steele was called for as an adjoiner.

The original field notes of the Hamlett, though made for Murphy, but forfeited in 1857, and in 1860 resurveyed with identical field notes for Hamlett, bear certificate of Wade as deputy surveyor of date February 21, 1839, that the survey had been made since August 1, 1838. These field notes were approved as correct by the county surveyor on April 22, 1839. They call for the Hamlett (or Murphy) to begin at the S. E. corner of the Bricker; thence to run S. 30 E. 1,900.8 varas to a marked corner; thence southwest to a marked corner; thence northwest to the southwest corner of the Bricker; thence northeast with the Bricker to the beginning.

The field notes of the Harris survey are signed by W. M. Rankin and John M. Wade, deputy surveyors. The certificate signed by the same surveyors, certifying that the survey had been made "since the first day of February, 1838," was dated February 15, 1838, manifestly an error. These field notes were approved as correct by the county surveyor of Montgomery county on April 5, 1839, filed in the General Land Office on May 1, 1839, and patent issued to said land on May 30, 1855. These field notes call for the Harris to begin on the river at the S. W. corner of the Steele; thence by measured meanders down the river to a marked corner; thence north 60 E. 3,033.1 varas *to the S. W. corner of the Bricker* survey; thence northwest with the Bricker to the south line of the Steele; thence southwest with the Steele 2,790 varas to the beginning.

The field notes of the Henderson likewise were signed by both Rankin and Wade, as is also the *certificate to them.* The certificate was not dated, but recited that the survey was made "since the first day of February, 1838." These field notes called to begin at the S. W. corner of the Harris, thence down the River, setting out 16 meanders by course and distance to a corner (no reference to the river being made other than to follow its meanders), "from which a bitter hickory 20 in. dia. marked H bears S. 75 degrees E. 10 vas. dist. and a lynn 8 in. dia. marked S bears N. 60 degrees E. 24 vas. dist."; thence N. 60 E. 3,062.9 varas to the S. W. corner of the Hamlett (Murphy); thence northwest with the Hamlett (Murphy) *to its N. W. corner*; thence southwest with the Harris to the beginning.

The field notes of both the Harris and the Henderson recite that these surveys were begun by Rankin and finished by Wade. There was evidence tending to show that the original surveys of the Harris and the Henderson surveys were begun by Rankin in the early part of 1838. In all probability Wade accepted the work done by Rankin on these surveys as far as he had gone, and merely completed these surveys from where Rankin stopped. In view of the general custom, now well known, of surveyors, where all of such territory was public domain, to first locate surveys bordering rivers by running out from a river as a boundary, as well as the requirements of the law then in force, Rankin undoubtedly first ran the meander lines along the San Jacinto River. But it is equally manifest, we think, that when Wade undertook to complete Rankin's work, and to run out in addition the Bricker and Hamlett (Murphy) surveys, he either ran out the Bricker first, or surveyed it independently of the location of the Harris. This is to be inferred from the fact that the only adjoinder called for in the Bricker field notes was with the Steele survey and the beginning corner of the Bricker was located on the Steele south line course and distance from the latter's S. W. corner. Other than the calls for the south line of the Steele, the Bricker corners were located in its field notes by bearing trees only. Whereas the Hamlett survey was located from, and called for adjoinder to, the Bricker; the Harris called for adjoinder to the Steele, the river as its boundary, and to the Bricker; and the Henderson called to adjoin the Harris and the Hamlett.

The only boundary line of these four surveys which can now be definitely identified on the ground by the marks of the original surveyor is the south line of the Henderson and Hamlett surveys. The State contends that these four surveys were run out by the surveyor Wade on four consecutive working days and should be considered as a block or system; that since the south line is the only line which can be definitely identified on the ground by original markings, all of said surveys should be located course and distance from this line, beginning at what the State contends is the original bitter hickory tree marking the S. W. corner of the Henderson; or if it be wrong in its identification of this tree, then at the point where this south line reaches the West San Jacinto River. As so located, the east lines of the Bricker and Hamlett surveys fall approx-

imately 500 varas west of where the defendants locate them, thus leaving the vacancy alleged.

The defendants contend that the S. W. corner of the Steele is definitely established at point C shown on the attached map; that the Bricker can be definitely located from this corner by its own field notes without reference to the other three surveys above set out; and that as so located no vacancy exists. Or, if the south line of the Henderson be run the distance along the accepted original south line from a point where the river meander line set out in the original field notes ends, if begun at point C, then there would be no vacancy. This point, as thus run, would be at the figure 8 on said map, and fall approximately 500 varas from an old channel of the San Jacinto River.

■ The State urgently insists that the bitter hickory tree called for in the original field notes of Rankin and Wade as a bearing tree for the S. W. corner of the Henderson was located by Boyles, surveyor, where the old marked south line of the Henderson intersects an old channel of the river. Much testimony related to the identity of the marks on the tree so found. The tree was cored by experts at the points where the various marks occurred, was cut down during the trial, and sections of it brought to Austin, and cut up both horizontally and vertically in an effort to verify the theories of the respective parties to the suit as to the bearing marks. Several surveyors testified that no H appeared on the tree. Boyles, who first concluded that it was the bitter hickory called for in the original field notes of Wade at the S. W. corner of the Henderson, testified on direct examination that in his opinion there was an old H marked on this tree, and traced an outline of such mark upon a photograph of the body of the tree. The evidence was undisputed, however, that Williams, who was directed by the Commissioner of the General Land Office in 1899 to resurvey the T. & N. O. surveys to the east of the Hamlett and Bricker surveys, ran out this old south line of the Henderson to where same intersected the San Jacinto River, and marked this same tree with his own surveyor's marks in 1899. These marks were, at the time of the trial, clearly discernible on the tree. Williams' marks consisted of a large X with two hacks directly above it, a blaze with a hack across it directly below the X, and three hacks below the blaze. After the tree had been dissected, it was shown that no marks prior to 1899 had penetrated beneath the bark of the tree, and Boyles admitted then that if there ever had been an H placed on said tree, it was not deep enough to penetrate the bark of the tree, and that portions of what he thought was an H were evidently part of the markings put there by Williams in 1899. He also testified that other portions of what he took to be delineations of an old H mark could have as well been faults in the bark of the tree. Williams, who was searching for this same corner in 1899, carefully examined this tree before he marked it himself, and testified that he found no bearing marks on it at that time. It was also clearly shown that if there had been the original H on said tree in 1899, marked where Boyles located a H on it, the markings placed thereon by Williams in 1899 would have obliterated part of the H; and it is clearly manifest, from an examination of the photographs contained in the exhibits, that portions, if not all, of what Boyles first took to be an old H mark on this tree were formed by the marks, and the edges of the blaze, placed on this tree in 1899 by Williams. These physical facts; the testimony of Williams that there was no mark on this tree in 1899 when he placed his marks on it; the dissection of the tree which negatived any mark older than 1899; the retraction in part, at least, if not altogether, by Boyles of his original testimony that he found what he deemed an H on this tree, when confronted with the dissected portions; and his conclusion, after such examination by him of the dissected portions, that he was probably in error about there being an original H on the tree put there in 1838—to our minds conclusively negatives the existence of such original mark on said tree, and presents no evidence of any probative value to go to the jury that there was such bearing mark on this tree. This tree, as an original bearing tree for the S. W. corner of the Henderson, will consequently be disregarded.

Appellants contend, however, that even if this bearing tree be disregarded, the S. W. corner of the Henderson must be located where this old line intersects the river, and the block of surveys located course and distance from such point, as being the only certain and definite corner ascertainable, and as thus located the vacancy claimed east of the Bricker and Hamlett necessarily results.

While the State contends that these four surveys were completed by Wade on four consecutive working days as follows: The Henderson, on January 18, 1839; the Harris, on January 19, 1839; the Bricker, on January 21, 1839 (January 20th being Sunday); and the Hamlett, on January 22, 1839—the record does not show this. The field notes filed in the General Land Office show the following:

The date written at the top of the Henderson field notes is June 28, 1838. The date appearing at the bottom of these field notes following the signatures of the deputy surveyors is, "Montgomery, January 18th, 1839." The certificate of the surveyors to these field notes is not dated.

The date written at the top of the Harris field notes is June 27, 1838. That following the signatures of the deputy surveyors is, "Montgomery, January 19, 1839," the 9 apparently written over another figure. But the date of the surveyors' certificate to these field notes is February 15, 1838.

The date *at the top* of the Bricker field notes is January 21, 1839. No date appears at the bottom of these field notes, and the certificate thereto made by Wade bears date of February 28, 1839.

The date at the top of the Hamlett (Murphy) field notes is January 22, 1839. No date appears at the bottom of these field notes, but the surveyors' certificate thereto bears date of February 27, 1839, one day prior to date of the certificate to the Bricker field notes.

Under these circumstances it is clear that these field notes fail to disclose when the actual surveys were made on the ground, or which survey was first run out by the surveyor. The certificate of Rankin and Wade that the surveys of the Harris and Henderson were made since February 1, 1838, was manifestly for the purpose of including the work done on these surveys by Rankin and later completed by Wade. When that work was completed by Wade is not shown. In all probability it was completed about the same time that Wade surveyed the Bricker and Hamlett. And the fact that Wade located the Bricker independently of these other surveys from the S. W. corner of the Steele, and then located the Harris, Henderson, and Hamlett by calling for adjoinder of these to the Bricker, rather indicates that he located the Bricker first. We attach no significant importance to the varying dates shown on the field notes of these various surveys, in view of the known custom of these early surveyors to record data of surveys in their field books, as they were required by law to do, as the surveys were actually made in the field; and at some subsequent date to prepare from such data official field notes in their offices for filing in the General Land Office. In view of the numerous surveys of public lands in this portion of Montgomery county along the West San Jacinto River during this same period, as shown by the exhibits in this record, this is manifestly what these deputy surveyors did. And the dates appended to these various field notes sent to the General Land Office is little if any indication as to when or in what order the surveys were actually made on the ground. Many of the dates on these old field notes are either patent errors or are irreconcilable. For instance, the field notes of the Steele, to which the Harris and the Bricker adjoin, are dated in the caption June 26, 1838, just one day prior to the first date in the caption of the Harris field notes, yet at the bottom of these field notes opposite the signature of Rankin, the surveyor, is the date November 14, 1838, but Rankin's certificate thereto that he had made said survey according to law, etc., bears date of February 14, 1838. Consequently, no more, if as much, reason exists for considering the Harris, Henderson, Bricker, and Hamlett surveys as a block or system of surveys run out together, than for considering the Smith, Steele, Harris, and Henderson, a system or block of surveys run out in conjunction with each other.

If the south line of the Steele can be located with certainty from known established lines, then the Harris and Bricker surveys should be located with reference thereto, because their original field notes call for such location. The first authentic survey shown to have been made on the ground since the original surveys in 1838 or 1839 was that made by Williams in 1899, when the Commissioner of the General Land Office directed him to resurvey the T. & N. O. surveys in this area east of the river surveys. The record shows that he then located as an original line the line now accepted as the original south line of the Henderson and Hamlett surveys. This line was located from an old original line then pointed out to him as, and which he took to be, the north line of the Smith survey, which adjoins the Steele

survey on its north line, and which was a senior survey to the Steele. Rankin surveyed originally the Smith and Steele, and undoubtedly ran the river meander lines fixing the north and south width of the Harris and Henderson, and the location of the south line of the Henderson. The original field notes of these four surveys called for an aggregate width, north and south, for these four river surveys of 7285 varas. In this distance Williams in 1899 found an excess of only 23 varas between the south line of the Henderson and an old marked north line of the Smith survey. He then ran the south line of the Smith from its north line at the distance called for in the original field notes (2,-041 varas) as the width of the Smith, and found that by giving all of the 23-vara excess to the Smith survey, its south line would fit the creek crossing called for by Rankin as marking this line. He thus established the north line of the Steele, and by using the exact calls in the original field notes for the Steele, Harris, and Henderson, the location of the south line of the Steele, and consequently the north line of the Harris and Bricker necessarily falls where he established it at point C shown on the map. Even if Williams were in error in giving all of the 23-vara excess in these four river surveys to the Smith, and such excess be prorated between all of said surveys, the south line of the Steele would in any event be only a few varas from where Williams located it at point C in 1899.

 It is not controverted that the field notes of the Harris and Henderson constitute perfect surveys—that is, that they close accurately and contain within their boundaries the amount of land called for. It is also a settled rule of law that where a survey is bounded by a river, and such boundary is delineated by meander calls in the field notes, the river as located on the ground constitutes the boundary of the survey, though the meander calls do not accurately follow its sinuosities. In such case the meander calls will be deemed as used to compute area, rather than as conclusively fixing the boundaries of the survey. State v. Atlantic Oil Prod. Co., Tex.Civ.App., 110 S.W.2d 953, writ refused, and cases therein cited. In the instant case the River undoubtedly constitutes the western boundary of the Harris and Henderson surveys. It does not necessarily follow, however, that Rankin and Wade began to run out the south line of the Hen-

derson from the bank of the stream. In properly locating a survey the cardinal rule is to follow the footsteps of the surveyor, if they can be ascertained. If no other evidence were available to indicate the contrary, it should be assumed that these surveyors did begin at the river as located on the ground. In the instant case, however, with two original parallel lines known on the ground, located approximately three and three-quarter miles apart (the north line of the Smith and the south line of the Henderson and Hamlett), and with the further knowledge that three intervening parallel lines were run between such base lines at definitely known distances from such base lines and from each other, the location of such intervening lines becomes a mere matter of surveying them out from known data. They can, therefore, be definitely and factually established on the ground. Manifestly the south line of the Steele would be definitely located 3,801.6 varas north 30 west from and parallel to the Henderson-Hamlett south line. When so located it intersected the West San Jacinto River at point C shown on the map, as Williams located it in 1899 and as Boyles, the surveyor for the State, admitted it should be located. This results in the definite location of the south line of the Steele, to which the Harris and Bricker called to adjoin; and the identified south line of the Henderson and Hamlett without original bearing trees being found to identify the river corners on either line as originally established by Rankin or Wade.

The meander line of the river was run, undoubtedly by Rankin, from the S. W. corner of the Steele. As run course and distance from point C its southern terminus ends on the south line of the Henderson 492 varas out from what the State contends is the S. W. corner of the Henderson. If, on the other hand, these course and distance meander calls be reversed from the point which the State places the S. W. corner of the Henderson (at point 9 on the map) the north end of such line, which should mark the S. W. corner of the Steele, falls on the west side of the river at a point where there is no evidence that the river ever ran. Manifestly the discrepancies cannot be reconciled. On the map introduced by the defendants, reflected by attached photostatic copy, is shown by the dotted lines the existence and location now on the ground of numerous sloughs, ponds, depressions, and old chan-

nels along the present course of the river. Many of these were shown to have been filled or partially filled with water.throughout. the year. The area so depicted was also shown to be covered with heavy timber underbrush, palmetto palms, difficult to traverse, and swamplike in character. It appears also that this river meander line, if run from point C (being the line from C to 8 shown on the map), for the most part skirts the east edge of this swamplike area along the river. It is very probable that, because of these facts, and the prevalence along the river itself of an abundance of mosquitoes (which the record indicates) at that time, the surveyor actually ran his meander line where the present survey thereof from point C shows it to be located. This appears to be a very plausible reason why the meander line does not accurately follow the channel of the river as it now flows on the ground.

On the other hand, if this meander line be treated as ending at the figure 9 on the map, where the State insists on locating the S. W. corner of the Henderson, and reversed courses and distances followed, the line would be placed almost wholly west of the river, where the surveyor was forbidden to go, in running out surveys east of the river.

■ The State also contends that under the testimony of its surveyor Boyles the jury could have found that the original S. W. corner of the Steele survey was located about 178 varas N. 80 west of point C, because he found what he took to be an old channel of Chrystal Creek (called for in the original field notes) running into the West San Jacinto River at that point. Boyles, however, in making the maps used and relied upon by the State, placed the S. W. corner of the Steele at point C, and used that point as such corner in locating the vacancy sought to be established. Five or six surveyors testified with reference to this south line of the Steele. All of them located it on the same place, including Boyles, along an old marked line generally accepted as the south line of the Steele. Most, if not all, of them found what they took to be an old channel of Chrystal Creek at the proper course and distance from point C called for in the original field notes of Rankin and Wade. In addition Williams who ran this line in 1899 to point C found the west corner of T. & N. O. survey No. 4. That survey was made by Wade in 1861, and called for the south line of the Steele. Manifestly Wade then knew, or at least ascertained, where he had run that line in 1838. We think, therefore, that the S. W. corner of the Steele was conclusively established at point C. The mere fact that Boyles testified that the location 178 varas N. 80 W. of point C was a *possible* location of this corner, when no bearing trees of any kind were found there; whereas, old bearing marks on trees at point C, being the end of a well marked line, were found; and the fact that neither Boyles nor any other surveyor ever placed the S. W. corner of the Steele at any place other than at point C—wholly fails to raise any jury issue as to the proper location of the S. W. corner of the Steele survey. This point must therefore be accepted as the definitely established location of the S. W. corner of the Steele survey.

Nor is this conclusion a departure from the rule urged by the State and stated in Standefer v. Vaughan, Tex.Civ.App., 219 S.W. 484, 490, and cases there cited, that "marks so found will control objects which are not found or which are uncertain and not known." Nor do the surveys here involved present an analogous situation to blocks of surveys laid out in West and Northwest Texas where prairies for the most part exist, tiers of surveys were made from some established starting point identifiable on the ground, and few if any natural objects appear from which to locate corners. In the instant case manifestly each survey involved was made as a separate survey, for separate owners, and the corners established with reference to natural objects on the ground at the time. Concededly the location of the south line of the Henderson and Hamlett surveys by original bearing trees would, if any doubt existed as to the location of the south line of the Steele, two miles away and parallel to it, be controlling as to the location of the latter line. But when the Steele line is definitely located, and no original marks can be found to establish on the ground either the S. W. corner of the Henderson or the S. W. corner of the Steele, no more reason exists for taking the point where one line intersects the River as the original corner fixed by the surveyor, than for taking the point where the other line intersects it. No issue is here presented as to the north and south width of the four surveys involved. The controlling question is how far east of the West San Jacinto River the Bricker and Hamlett surveys are to be located.

The next contention made by the State is that regardless of the true location of the S. W. corner of the Steele survey, or if it be conceded that it is located at point C shown on the map, the N. W. corner of the Bricker must be located 2,290 varas therefrom instead of 2,790 varas, for the reason that the original field notes of Wade first contained 2,290 varas for this call, and that the figures 2,290 had been changed by someone other than Wade to read 2,790 by writing over the original figure 2 a figure 7. That these field notes were prepared prior to 1840 when the Spanish Civil Law governed in Texas and such change not being made and authenticated in accordance with the requirements of the Spanish Civil Law was void, and the original figures of 2,290 varas for this call must control.

It seems now settled that the *validity* of land grants is referable to the law in force at the time such grants were made. Miller v. Letzerich, 121 Tex. 248, 49 S.W.2d 404, 85 A.L.R. 451; Manry v. Robison, 122 Tex. 213, 56 S.W.2d 438. The common law was not adopted in Texas until 1840. The Spanish Civil Law undoubtedly prevailed in the Republic of Texas in 1838 and 1839, when these field notes were prepared, authenticated and forwarded to the Commissioner of the General Land Office, except where superseded by the laws of the Republic. The common law was in force when the patent was issued in 1845. It is likewise true that if there be a conflict between the field notes of the patent, and the field notes of the surveyor filed in the General Land Office, if the latter field notes represent the footsteps of the surveyor on the ground, the original field notes, rather than those contained in the patent, control in the location of the grant. State v. Talkington, Tex.Civ.App., 274 S.W. 314.

On this issue the State contends that it conclusively appears that Wade's original field notes of the Bricker placed its N. W. corner at 2,290 varas from the S. W. corner of the Steele, and that these figures were altered by some one other than Wade to read 2,790 varas. That under the rule announced in Hanrick v. Cavanaugh, 60 Tex. 1, this alteration, because not authenticated as required by the Spanish Civil Law, was void, and the original call for 2,290 varas prevails. The evidence in this regard was substantially as follows: The photostatic copy of the original field notes shows that the second and third figures of this call as originally written were written over with the figures 7 and 9. The first and last figures remained as originally written. A draftsman in the General Land Office testified that the original figures, 2,290, were written in brown ink, and the figures 7 and 9 had been written over them in blue ink. There also appeared on these original field notes in the margin of the sheet opposite this call, written in brown ink, the figures 2,790, in parenthesis. A handwriting expert, called by the State as a witness, testified that in her opinion the figures 2,790 in parenthesis in the margin opposite the original figures written by Wade, were written by Robinson, the county surveyor, who approved the field notes and certified them to the General Land Office as correct; and were not, in her opinion, written by Wade. This testimony was based upon her examination of the original field notes with a magnifying glass. She also testified that the blue ink used in writing over the original figures 2 and 9 did not come into commercial use until 1848. The above is substantially the State's evidence on this issue.

Upon the trial the defendants called as a witness the chief draftsman of the General Land Office who had served 18 years in that office, and had him examine these original field notes under a microscope. He testified, after such examination, that this microscopic examination disclosed, in his opinion, that in the original figures for this call there had been written in brown ink both a 7 and a 2 as the second figure of this call. While no question is raised but that the third figure in this call was a 9 in the original prepared by Wade, this figure also was written over in blue ink with another 9. It was also shown, without question, that in the field notes for the Harris, also prepared by Wade, and calling to adjoin the Bricker on this same line, the distance called for was 2,790 varas. Manifestly, if this call in the Bricker field notes had been obliterated to such an extent that the figures were not legible, the call in the Harris field notes for the same line between the same two points would be conclusive. Likewise the patent to the Bricker, issued at least three years before the ink used, according to the testimony, to write over the figures questioned came into use, called for this line to be 2,790 varas long. All of the maps of Montgomery county used in the General Land Office show the distance of this call to be 2,790 varas. While the original "Land

Warrants Book" kept by the surveyor had become so mutilated that it did not show these calls, the field notes shown in ·that book were transcribed on the records of Montgomery· county in 1884 and certified by the County Surveyor as correct and a true copy of· the original. These call for distance of 2,790 varas for this line.

It was also shown that Wade surveyed 400 acres out of the S. W. corner of the Steele sometime prior to 1862 wherein he called for the S. W. corner of the Steele and to run from that corner with the south line of the Steele a distance of 2,823 varas to a point on the common boundary line between the Bricker and the Steele, 32 varas N. 60 E. from the N. W. corner of the Bricker, thus recognizing 2,790 varas as the correct distance for the line he had run in 1838. In January, 1861, Wade also made a survey of the T. & N. O. survey No. 4, adjoining the Bricker and Steele on the east. That survey called to run with the east line of· the Bricker to its N. E. corner on the south line of the Steele; thence with the Steele N. 60 E. 1043 varas to its S. E. corner. This 1,043 varas, plus the 1,901 varas, the north line of the Bricker, plus 2,790 varas, between the Bricker and the River, aggregate the exact length of the south line of the Steele called for in its original field notes. This necessarily was a declaration by Wade again that the distance between the N. W. corner of the Bricker and the S. W. corner of the Steele was 2,790 varas. It is not controverted that there is a marked line on the ground for the Bricker west line beginning at the point on the Steele 2,790 varas from its S. W. corner. These marks appear to be of different ages. The State contends that the oldest ones found were made by Williams when he was resurveying the T. & N. O. surveys in 1899; but Williams testified that he did not run the west lines of the Bricker and Hamlett at that time. One of the bearing trees found at the S. W. corner of the Bricker, if located as defendants contend and the trial court manifestly found, contained marks estimated by experts as being between 62 and 70 years old, put there perhaps by Wade himself in subsequent surveys in that vicinity.

█ All of the cases cited in support of the contentions made by the State, wherein land grants were involved, arose in cases where the grant itself emanated from the Government of Spain, the Government of Mexico, or the State of Coahuila and Texas, made prior to· the establishment of the Republic of Texas. In view of the Constitution of the Republic and of the State, and subsequent legislative acts, their validity is of course referable to the laws in force under which said grants were made. The efficacy of the grant itself depended upon a compliance with the law which authorized it. But no such case is here presented. In the instant case the grant emanated from the Republic of Texas. The validity of the grant itself is not questioned. No issue of fraud, collusion, or forgery is raised. The only issue presented is that of the location of a boundary of an admittedly valid grant, and this along an established line. Whatever may have been the requirements of the Spanish Civil Law with reference to grants dependent upon that law; dependence upon it as a source of title ceased with establishment of the Republic; and after the adoption of the Constitution of the Republic and the passage of legislation thereunder, the citizens of Texas enjoyed their rights and acquired their property under that sovereignty and under the provisions of its laws. On December 14, 1837, the Congress of the Republic passed over the veto of the President (see Gammels Laws of Texas, vol. 1, pps. 1404–1418) an act establishing the General Land Office, and provided, among other things, as follows: "That there shall be elected by joint vote of both houses of congress, for each county, a county surveyor, who shall reside at the county seat, and whose duty it shall be to receive and examine all field notes of surveys, which have been or may hereafter be made in said county and upon which patents are to be obtained, and shall certify the same under his hand to the commissioner of the general land office, after having recorded the same in a book to be kept by him for that purpose * * *."

This act further provided that such surveyor make a bond in the sum of $10,000; for appointment of deputies, for administering to them the oath of office, and for requiring bond of his deputies.

█ Manifestly the survey here involved was made under the provisions of this act. The certificate of the county surveyor as to the correctness of such field notes was necessary before they could be filed in the General Land Office. His certificate was therefore an official act of a public officer. Of course, he had no authority to materially change such field notes, but he undoubtedly had authority to correct obvious errors so as to make them recite

the true facts. This, at most, is manifestly all that he did in the instant case, and it should be presumed, especially after this lapse of time, and after the issuance of the patent by the Republic, that he properly discharged his official duties.

■ In view of all the facts and circumstances, however, we think the conclusion is inescapable that Robinson, the county surveyor, made no change in Wade's original field notes. An examination of the original field notes of surveys made by Rankin and Wade in this vicinity in these early days of the Republic shows that corrections were not infrequent. Such corrections were made, not by erasures of manifest errors, but by writing the correct figure or letter over the incorrect one. Obviously ink eradicators and ink erasers were not at the disposal of these rugged pioneers. The writings appear to have been done with a quill pen. Mistakes were not uncommon. Even in this same set of field notes as a call for the east side of the Bricker there appears to. have first been written by the scrivener the distance call of 1,908.8 varas, and the correction made to 1,900.8 varas by merely writing over the erroneous figure 8 a 0 without any erasure or notation. In the light of the testimony of the chief draftsman of the General Land Office, after examining this call under a microscope, that he found that both a 2 and a 7 had been written in brown ink as a second figure in this call; and the further fact that the figure 9 in this call was also written over, though it is admitted that this figure 9 was placed there originally; we think the most plausible, if not conclusive, explanation is that Wade in writing the distance first wrote it 2,-290, discovered his error, and wrote a 7 over the 2; and that in doing so, in connecnection with the third figure, or the 9, the call distance became illegible or uncertain. And when Robinson, whose official duty it was to return correct field notes to the General Land Office, merely wrote on the margin the figures 2,790 to clarify the illegibility, and to make sure what this distance call actually was. Under these circumstances there was no alteration nor change in the original field notes as made by Wade. And, as stated, after this lapse of time, and in view of the patent, the official maps in the General Land Office and all subsequent instruments, particularly the field notes of the Harris survey over the identical line, all calling for or recognizing this call as being for 2,790 varas,

we think it should now be conclusively presumed to be correct; and should not, after the lapse of nearly a hundred years, now be permitted to be questioned. Blaffer v. State, Tex.Civ.App., 31 S.W.2d 172, 191, writ refused.

■ By locating the Bricker according to its own field notes from point C on the map, which we think was established as a matter of law from known lines as the S. W. corner of the Steele, the Bricker falls in the position contended for by the defendants, along marked lines, one of the bearing trees of which lines bears marks between 62 and 70 years old, and the vacancy sued for does not exist. And where a survey can be located according to its own field notes from established corners called for therein, this is the proper method of location, rather than to look to the field notes of other surveys, especially when by relying on the field notes of other surveys, inconsistencies will occur and conflicts with other surveys result. Thompson v. Langdon, 87 Tex. 254, 28 S. W. 931; Upshur County v. Lewright, Tex. Civ.App., 101 S.W. 1013; Petty v. Paggi Bros. Oil Co., Tex.Com.App., 254 S.W. 565.

Having concluded that the record not only fails to show that the vacancy sued for does exist, but that it affirmatively shows that it does not exist, the issue as to the cross-plaintiffs' mineral lease thereon becomes immaterial. Finding no error in the record, the judgment of the trial court is affirmed.

Affirmed.

### On Motion for Rehearing.

In their motion for rehearing, appellants assert, among other things, that the record does not support our statement that Williams who ran out the south line of the Steele in 1899 found the west corner of the T. & N. O. survey No. 4. In this they are correct, and this statement in our opinion is corrected accordingly. Williams testified that he did not find such corner as established, if it was so established, by Wade in 1861. This, however, was but one of the circumstances considered by us, as indicating that Williams correctly located the south line of the Steele, and without it, our conclusion from the other evidence that he did so is the same.

Our attention is also called to the statement that the tree bearing marks estimated at from 62 to 70 years old was one of the bearing trees at the S. W. corner of the Bricker. The tree in question, how-

ever, was not at the S. W. corner of the Bricker as located by appellees, but on the west line of the Bricker as so located, some distance north of such S. W. corner. The probative value of such marking, therefore, whatever it may be, must be limited as indicating a line tree, and not as a mark for a corner. This correction is also made in the interest of accuracy.

Appellants also insist that Wade did not run the south line of the Steele survey, but that same was run out by Rankin in 1838. Undoubtedly Rankin did run out this line when he surveyed the Steele. The inference is inescapable, however, that Wade must have likewise run out this line, at least from the river corner, when he surveyed the Bricker and located its corner by bearing trees on the ground on this line.

Appellants' motion is granted to the extent above indicated. In all other respects it is overruled.

Granted in part and in part overruled.