In The
Court of Appeals
For The
First District of Texas
____________
NO. 01-02-00461-CV
____________
 
CHARLOTTE ANN KAECHELE MIETH; BONNIE REZNICEK, AGENT AND
ATTORNEY-IN-FACT FOR ROYCE MARIE KAECHELE; BONNIE JEAN
KAECHELE REZNICEK; BONNIE JEAN KAECHELE REZNICEK,
SUCCESSOR TRUSTEE OF THE CHARLES KAECHELE TRUST FOR ROYCE
M. KAECHELE AND SUCCESSOR TRUSTEE OF THE CLARA KAECHELE
TRUST FOR ROYCE M. KAECHELE, APPELLANTS
 
v.
 
RANCHQUEST, INC.; TEXICAL ENERGY CORPORATION D/B/A
TEXICAL, INC.; AMCAS, INC.; ROBERT HUCKABY; PENSOR
PRODUCTION COMPANY; ROBERT LEON; AND
TEX-ATIC RESOURCES, INC., APPELLEES
 

 
 
On Appeal from the 155th District Court
Austin County, Texas
Trial Court Cause No. 97V095
 

 
 
OPINION ON REHEARING
           We grant appellee’s motion for rehearing, withdraw our opinion issued July 31, 2003,
and issue this opinion in its place. 
           In October 1997, appellants sued appellees to recover damages caused to their surface
estate by appellees’ operations at and re-entry of an abandoned oil and gas well. The case
was tried to a jury in 2001, and the jury found that Texical Energy Corporation d/b/a Texical,
Inc. (Texical) was 100% liable for negligence proximately causing injury to appellants’
property. The jury awarded $200,000 as reasonable costs to repair appellants’ property,
$10,000 in compensatory damages, and $88,000 in attorney’s fees, but found that there was
no diminution in the value of appellants’ property. The trial court concluded that the injury
to the property was permanent and, therefore, that the correct measure of damages was the
diminution in value to the land. Because of the jury finding of no diminution in value, the
trial court rendered judgment for appellees. We reverse in part and remand the cause for
further proceedings.
Background
A.       The Lease Operation
           Appellants own the surface of a 973-acre tract of grazing land in Austin County,
Texas. This tract, which was purchased in 1952 by appellants’ father, Charles Kaechele, who
is now deceased, was referred to as the “Best” tract. In 1992, appellants and the owners of
the mineral estate executed an oil and gas lease to appellee Ranchquest, Inc. (Ranchquest). 
Sometime before March 16, 1996, drilling operations were begun on the well known as Best
No. 2 well, which was located on the northern 300+ acres of the 973-acre tract.
           Robert Leon and Robert Huckaby, the individual appellees, owned or controlled a
group of corporations, including appellees Ranchquest, Texical, Tex-Atic Resources, Inc.
(Tex-Atic), and Amcas, Inc. (Amcas). Ranchquest acquired oil and gas leases, and Texical
operated the oil and gas wells on those leases. Tex-Atic was the corporate entity Leon and
Huckaby used at the time of trial to operate oil and gas wells on the leases acquired by
Ranchquest. Amcas was the corporate entity Leon and Huckaby used as the repository of
investors’ funds to be used in drilling, completing, equipping, and operating oil and gas wells
drilled on behalf of Texical or Tex-Atic on leases acquired by Ranchquest. Appellee Pensor
Production Company (Pensor) is a drilling contractor.
           In July 1996, Pensor entered into a contract with American Cascade Energy, Inc.,
Texical’s predecessor, to provide the rig and crew that would take over the drilling on the
Best No. 2 well. In August 1997, Pensor’s contract was amended to add the Best No. 3 well. 
Appellees continued operations on the Best No. 2 well through the remainder of 1996 and
into 1997. Appellees did not construct reserve pits or a ring levee around the Best No. 2 well
surface location until after March 1997. As a result, the drilling fluids, diesel fuel, oil, and
saltwater used in the operations were discharged onto appellants’ pasture, and raw sewage
was discharged into open pits. Although appellees decided to construct a reserve pit for the
Best No. 2 well in 1997, they never closed it. The Best No. 2 well produced for a few days
in December 1997 and January 1998, but was no longer producing at the time of trial.
           In August 1998, appellees began working on the Best No. 3 well, also located on the
northern 300+ acres of the tract. Although a reserve pit and a ring levee were constructed
for the Best No. 3 well, appellees pumped fluids out of the pit and into a ditch that had been 
dug to run fluids into a nearby creek.
B.       Texas Railroad Commission Reports
           During trial, the Railroad Commission (the Commission) reports on the Best Nos. 2
and 3 wells were admitted into evidence. The operations and conditions maintained on the
Best No. 2 well location resulted in some 24 Texas Railroad Commission inspections. The
Best No. 2 well was cited on almost every inspection for violating Railroad Commission
Statewide Rule 8 (Rule 8).


 On March 3, 1999, the Commission issued a report containing
findings of fact regarding alleged violations committed at the Best No. 2 well. The report
notes that the Commission’s inspections were conducted from December 18, 1996 through
August 28, 1998. The Commission found that the operator had caused or allowed the
discharge of 20 to 30 gallons of lubricating oil from machinery.


 The Commission also
found overflowing mud tanks combined with rain wash-off from the rig, affecting an area
of approximately 100 by 150 feet on the west side of the rig. In addition, other oil discharges
from around the diesel motors had flowed from a 70-by-8-foot pit into an adjacent pasture. 
The Commission noted that, on January 23, 1997, the affected area had increased in size to
approximately 300 by 500 feet and that the inspectors had observed an oil and diesel sheen.


 
The report noted that the operator was also using the reserve pit for disposal of raw sewage
from a trailer house and that recent rainwater had caused the pit to overflow.
           The Commission’s report on the Best No. 3 well showed that, in August 1998,
appellees began work on this well. Before commencing drilling operations, appellees
constructed a reserve pit and a ring levee at the Best No. 3 well location. However, appellees
pumped fluids out of the reserve pit and into a ditch that had been dug to run the fluids into
the East Little San Bernard Creek. The Commission made 22 inspection visits to the Best
No. 3 well location and found numerous violations of Rule 8. Unlike with the Best No. 2
well, the Commission’s findings of fact on the Best No. 3 well were not included in the
record. As of the time of trial, the reserve pit on the Best No. 3 well location was still open. 
C.       Testimony
           1.        Frank Roberts, Jr.
           At trial, Frank Roberts, Jr., who worked as a consultant for appellees, testified that the
site around the Best No. 3 well was cleaned up during the summer of 1999 and was left in
as good a shape as it could have been after a drilling completion. The reserve pits on the
Best Nos. 2 and 3 well sites were still in existence and were then open because appellants had
threatened the contractor and told him not to close the sites. The black, cracked, thick
substance shown in photographs taken by appellants in February 1999 was simply a mixture
of graphite and glycerin used in conjunction with mud to get the pipe to slide free. This
mixture, which was regularly used in these types of drilling operations, was non-toxic and
could easily be disposed of. Pensor took over the drilling operations on the Best No. 2 well
in July 1996, but a ring levee and reserve pit were not constructed until early 1997, and the
drilling operations ended sometime in early June 1997.
           Roberts, who was working with Texical on the Best No. 3 well at the time, arrived at
the site shortly after the Commission had inspected the Best No. 3 well. The inspection
revealed that the reserve pit had overflowed and had reached the road drainage, discharging
into the creek at a rate of one gallon per minute. The inspector noted that drilling fluid had
overflowed the reserve pit embankment, affecting an area of approximately 20 by 30 feet. 
Because there was no sewage septic tank, all sewage was discharged into earthen pits. 
Roberts agreed to remediate the soil contaminated by the drilling fluid, which he did a few
days later. 
           Roberts further testified about the following inspections: 
           •         January 26, 1999: there were no additional violations, but the drilling-fluid
residue coating the bottom of the ditch still remained and needed to be cleaned. 
 
           •         February 3, 1999: the drainage ditch going into the creek had not been cleaned
up and was backing up with water.
 
           •         February 29, 1999: Roberts agreed to have the drilling fluids in the ditch
cleaned up.
 
           •         March 3, 1999: about five gallons of oil were on the ground where the drilling
rig motors had been.
 
           •         June 21, 1999: the north pit contained chloride levels of 450 parts per million
(ppm) and had a film of oil covering 20% of the pit; the south pit contained a
chloride level of 35,800 ppm and no oil.
 
           •         August 3, 1999: both pits remained open, both had a skim of oil on them, and
the south pit contained saltwater chlorides of 35,000 ppm.
 
           •         Subsequent inspections revealed that heavy rains had resulted in more
saltwater inside the pits. Roberts said that, when a pit is dewatered, it leaves
behind some chlorides and that the chloride content is likely to rise when
mixed with rainwater. 
 
           2.        Michael Swetish
           Appellants’ expert, Michael Swetish, an environmental scientist, testified that, in his
opinion, both sites were heavily impacted by salt. Many of the pits remained open; the pits
had high salt levels in them; the salt extended beyond the pit boundaries; and oil and
hydrocarbons remained in the pits. In his opinion, the sites were in need of remediation
because the contaminants that remained on the sites were elevated to levels that would
impact the landowners’ property if not corrected. Should the contaminated soil not be
decontaminated, the contaminants would, over time, seep into the soil deeply enough to
contaminate the underground water sources.
           Swetish testified that, if a pit contained high levels of contamination, the contaminated
material could be removed and taken to a treatment facility and the pit backfilled with clean
material. Swetish collected soil samples and conducted three soil surveys, at depths of from
3 to 18 feet, which revealed high levels of chlorides in the drill material, ranging from
108,000 to 57,000 ppm on the Best No. 2 well and from 48,000 to 47,000 ppm on the Best
No. 3 well. Swetish concluded that the sites were contaminated with salt levels sufficient to
restrict vegetative growth and to disperse salt into the surrounding environment, not only by
spreading laterally, but, with time, by moving more deeply into the ground, potentially
impacting deeper zones of soil and ground water. Swetish estimated that the remediation,
which would include excavating, transporting, and disposing of the contaminated material
and replacing that material with clean fill, would cost $288,000. On cross-examination,
Swetish testified that the remediation plan that he suggested covered a total of four acres and
that he had not conducted any ground-water studies to support his conclusion that the
existing conditions, if left unrepaired, would result in ground-water contamination.
           3.        Frank Reznicek
           Frank Reznicek, the husband of appellant Bonnie Reznicek, had worked on the
Kaechele ranch since 1980. At the time of trial, he was the ranch manager and planned and
oversaw the day-to-day activities at the ranch. He testified that the defendants had polluted
the property with diesel oil and salt water and that the chlorides about which the plaintiffs
were complaining were present on the property at all times and did not come and go with the
rain. He also testified that the contamination had been basically the same since 1996.
           4.        Robert Moorman
           Robert Moorman, a real estate appraiser and appellees’ expert witness, testified that
he was able to form an opinion of the current fair market value of the Best tract after
inspecting the property and researching for comparable sales. In his opinion, the market
value of the Best tract was $750 per acre, a total of $730,000. He testified that, if the four
acres were contaminated, then the maximum diminution in value of appellant’s property
would be $3,000.
 

           5.        William Haley
           William Haley, appellants’ expert in real estate appraisals, testified that he used the
sales-comparison approach in determining the fair market value of appellants’ property. He
testified that this approach compares the property being appraised to similar properties that
have been sold in the area, taking into account any particular features that could raise or
lower the value of the property. He concluded that the fair market value of appellants’
property was $730,000 before the contamination and $430,000 after the contamination. His
basis for the $300,000 diminution in value was the cost to remediate, plus management costs
or administrative costs typically incurred by the owner in decontaminating the property. 
Analysis
A.       Temporary or Permanent Injury
           In their first issue, appellants contend that the trial court erred in determining that the
damage to their property was permanent, rather than temporary.
           Permanent damage results from activity that is of such a character and that exists
under such circumstances that it will be presumed to continue indefinitely. Bayouth v. Lion
Oil Co., 671 S.W.2d 867, 868 (Tex. 1984). Permanent injuries are those that are constant and
continuous, not intermittent or recurrent. Atlas Chem. Indus., Inc. v. Anderson, 524 S.W.2d
681, 685 (Tex. 1975), overruled on other grounds, Burk Royalty Co. v. Walls, 616 S.W.2d
911, 922 (Tex. 1981). When the turf or sod is so injured as to make the land less productive
in the future, the injury is permanent, even though it may not be perpetual. See Ft. Worth &
N.O.R. Co. v. Wallace, 12 S.W. 227, 228 (Tex. 1889). The proper measure of damages for
permanent injury to the land is the diminution in the value of the land. Kraft v. Langford,
565 S.W.2d 223, 227 (Tex. 1978).
           Temporary injuries have been found when the injury is not continuous, but is
intermittent, sporadic, or recurrent and is contingent upon some irregular force, such as rain. 
Bayouth, 671 S.W.2d at 868. When an injury to land is temporary and can be remediated at
reasonable expense, the proper measure of damages is the cost of restoration to its condition
immediately preceding the injury. Kraft, 565 S.W.2d at 227. However, the diminution in fair
market value is the measure to be applied when the cost of restoration exceeds the diminution
in fair market value. See Bates v. Schneider Nat’l Carriers, Inc., 95 S.W.3d 309, 312 (Tex.
App.—Houston [1st Dist.] 2002, pet. granted).
           In this case, the evidence showed that the ground was so injured as to impair the
productivity of the soil and that the injury had been constant since 1996. Therefore, the trial
court did not err in determining that the damage to the tract of land was permanent. We
overrule appellants’ first issue. 
B.       Unsolicited Offer to Purchase
           In their third issue, appellants contend that the trial court erred in allowing the
introduction of Amcas’s unsolicited and unaccepted offer to purchase the Best tract as
evidence of market value of their property because that offer constituted an inadmissible
offer of settlement. Appellants claim that the unaccepted offer to purchase was used by
appellees to argue that there was no diminution in value to the Best tract. 
           Amcas offered, in writing, to purchase appellants’ property for $730,000, which was,
according to Swetish, the estimated fair market value of the property before the injury. The
offer, which was admitted into evidence, stated, “This letter is not an offer of settlement and
is not intended in that manner.” Appellants did not accept the offer.
           Texas Rule of Evidence 408 states, “Evidence of (1) furnishing or offering or
promising to furnish or (2) accepting or offering or promising to accept, a valuable
consideration in compromising or attempting to compromise a claim which was disputed as
to either validity or amount is not admissible to prove liability for or invalidity of the claim
or its amount.” Tex. R. Evid. 408. 
           Amcas’s offer to purchase the property stated specifically that it was not a settlement
offer and did not ask appellants to compromise their claim in any way. See Tatum v.
Progressive Polymers, Inc., 881 S.W.2d 835, 837 (Tex. App.—Tyler 1994, no writ).
           We hold that the unaccepted offer to purchase was not a settlement offer. 
Accordingly, we overrule appellants’ third issue. 
C.       Negligence Per Se
           In their fourth issue, appellants contend that the trial court erred in refusing to submit
their requested instruction on negligence per se because the evidence established Texical’s
repeated violations of Rule 8.
           Negligence per se is a concept whereby a legislatively imposed standard of conduct
is adopted by the civil courts as defining the conduct of a reasonable and prudent person. 
Carter v. William Sommerville & Son Inc., 584 S.W.2d 274, 278 (Tex. 1979). In such a case,
the jury is not asked to decide whether the defendant acted as a reasonable, prudent person
would have acted under the same or similar circumstances. Id. The statute itself states what
a reasonable, prudent person would have done. Id. If an excuse is not raised, the only
inquiry for the jury is whether the defendant violated the statute or regulation and, if so,
whether the violation was a proximate cause of the accident. Id.
           Texas courts will not adopt an administrative rule or regulation as a standard for
negligence unless a purpose of the rule is to afford protection to the class of persons to which
the injured party belongs from the hazard involved in the particular case. Cont’l Oil Co. v.
Simpson, 604 S.W.2d 530, 534 (Tex. Civ. App.—Amarillo 1980, writ ref’d n.r.e.); see also
Carter, 584 S.W.2d at 278. Section 91.101 of the Texas Natural Resources Code specifically
provides that the Commission “shall adopt and enforce rules and orders . . . to prevent
pollution of surface water or subsurface water in the state.” Tex. Nat. Res. Code Ann.
§ 91.101 (Vernon 2001). Rule 8, subsection (b) states that “no person conducting activities
subject to regulation by the commission may cause or allow pollution of surface or
subsurface water in the state.” 16 Tex. Admin. Code § 3.8 (2002) (Tex. R.R. Comm’n,
Water Protection).  Rule 8 clearly affords protection to the class of persons to which
appellants belong, i.e., surface owners, against the hazard involved, i.e., pollution of surface
and subsurface water. Therefore, negligence per se is a concept that applies to the facts of
this case. Accordingly, the trial court abused its discretion in refusing to submit an
instruction on negligence per se. However, because the jury found Texical negligent under
the common-law definition, the trial court’s error was harmless. We overrule appellant’s
fourth issue. 
D.       Legal and Factual Sufficiency
           In their fifth issue, appellants challenge the legal and factual sufficiency of the
evidence to support the jury findings in question numbers five, seven, and eight. Appellants
argue that the trial court erred in denying their motion to disregard these jury findings
because the jury’s answers to these three questions were not supported by the evidence.
           1.        Question 5—The Jury’s Finding Regarding Ranchquest
           Jury question number five asked, “Do you find that Ranchquest, Inc. failed to comply
with paragraphs 14 and 15 of the lease?” The jury answered, “No.”
           Appellants claim that the jury’s refusal to find that Ranchquest failed to comply with
paragraphs 14 and 15 of the lease was not supported by the evidence.


 Appellants contend
that “Texical and Amcas were responsible for Ranchquest’s performance of the Best Lease
and became responsible for compliance with the Best Lease.” They also argue that “Texical
was the successor operator and was responsible for compliance with the oil and gas lease as
Ranchquest’s assignee and designated operator.” The lease states, “Lessee and/or his
successors in interest, shall compensate the Grantee . . . .” (Emphasis added.) The jury
could have reasonably concluded that only Texical, as Ranchquest’s successor operator, was
negligent and, thus, responsible for the damage caused to appellants’ property. We overrule
that part of appellants’ fifth issue complaining about the jury’s response to question number
five.
           2.        Question 7—Damages
           Appellants contend that there is no evidence to support the jury’s answers to question
number seven. Question number seven and the jury’s answers were as follows:
What sum of money, if any, now paid in cash, would fairly and
reasonably compensate Plaintiffs for their damages, if any?
 
Do not include any amount for any condition existing before the
occurrence in question, except to the extent, if any, that such other condition
was aggravated by any injuries that resulted from the occurrence in question.
 
Do not include in your answer any amount that you find Plaintiffs could
have avoided by the exercise of reasonable care.
 
Consider the following elements of damages, if any, and none other:
 
1)the reasonable and necessary cost to remediate the surface of
Plaintiff’s land.
 
                                 Answer: $200,000
 
2)the diminution, if any, in the fair market value of the Plaintiff’s
land.
 
                                 Answer: $0
 
           We first consider the jury’s finding in part two of question seven. Two witnesses
testified regarding the property’s diminution in value: Haley, a real estate appraiser who
testified for the appellants, and Moorman, a real estate appraiser who testified for appellees. 
Haley testified that the fair market value of appellants’ property was $730,000 before the
contamination and $430,000 after the contamination.
           Moorman testified that he had been told that real estate with a pocket of contamination
could be sold by cutting the contaminated area from the sale and that the diminution in fair
market value would be the number of acres times the value per acre. In this case, the number
of contaminated acres was four, and the property was valued at $750 per acre. Moorman
calculated that the maximum diminution in value of appellants’ property would be $3,000. 
           Appellees argued to the jury that their offer to buy the property for $730,000 was
proof that there was no diminution in value. This argument is contrary to settled case law. 
           Texas courts have long held that unaccepted offers to purchase property are no
evidence of market value of property. Hanks v. Gulf, Colo. & Santa Fe Ry. Co., 320 S.W.2d
333, 336-37 (Tex. 1959); Lee v. Lee, 47 S.W.3d 767, 785 (Tex. App.—Houston [14th Dist.]
2001, pet. denied). The courts have found this evidence uncertain and speculative because
evidence of an unaccepted offer does not establish the good faith of the person making the
offer. Hanks, 320 S.W.2d at 336-37; Lee, 47 S.W.3d at 785. Amcas’s offer to purchase was
irrelevant to the issues in this case because it was no evidence of the fair market value of the
property and should not have been admitted over appellants’ objection.


 Irrelevant evidence,
even though admitted without objection, will not support a judgment. Porras v. Craig, 675
S.W.2d 503, 505 (Tex. 1984). There was no evidence to support the jury’s finding of no
diminution in the value of appellants’ property. Accordingly, we sustain appellants’ fifth
issue as it relates to part two of jury question seven.
Conclusion
           Because our disposition of part two of appellants’ fifth issue requires reversal of the
judgment and a remand to the trial court, we need not reach appellants’ complaints regarding
alleged comments on the weight of the evidence, the sufficiency of the evidence supporting
the jury’s findings on cost to remediate, and attorney’s fees. 
           We reverse that portion of the trial court’s judgment ordering that appellants take
nothing against appellee Texical and remand the cause for further proceedings. The
remainder of the judgment, not having been challenged on appeal, remains in full force and
effect. 
 
 
                                                                             Sam Nuchia
                                                                             Justice

Panel consists of Chief Justice Radack and Justices Nuchia and Hanks.