COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| ARTURO CONTRERAS, | | No. 08-09-00321-CV |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 168th District Court |
| | § | |
| JAMES ROBERT BENNETT and | | of El Paso County, Texas |
| HILDA M. BENNETT, | § | |
| | | (TC # 2006-4621) |
| Appellees. | § | |

**O P I N I O N**

Between July 27 and August 7, 2006, more than fifteen inches of rain engulfed the City of El Paso, an amount nearly twice the annual average for the desert city.[1] The deluge sent mud and rocks cascading into some parts of the city, destroying as many as 300 homes and causing an estimated $100 million in damage. Against this back drop, we consider here a claim for damages to a residence arising from violations of the Texas Water Code. A jury found that Arturo Contreras wrongfully diverted surface water and awarded James and Hilda Bennett $43,000 in cost of repair damages and $25,000 in diminution of value damages. The trial court entered judgment for the Bennetts and ordered Contreras to pay $68,000 in actual damages plus prejudgment interest and court costs. On appeal, Contreras complains the evidence is legally or factually insufficient and that the trial court awarded a double recovery. We affirm in part and reverse in part.

**FACTUAL SUMMARY**

---

[1] http://www.usatoday.com/weather/stormcenter/2006-08-06-ElPaso-floods_x.htm.

James and Hilda Bennett bought a home in the Richmar Subdivision in 1972. Their home is located on a slope. At the foot of the slope, near the edge of the Bennetts' property, there was a rock wall which enclosed the backyard. On August 1, 2006, after a severe rainstorm in El Paso, a significant portion of the rock wall collapsed and caused severe damage to the wall and the backyard.

### The Pleadings

The Bennetts filed suit on October 19, 2006 alleging causes of action against three of their neighbors--Martha Lozano, Arturo Contreras, and Margaret Aboud--for the damages to their property. Their claims included negligence, wrongful diversion of surface water in violation of Section 11.086(a)(3) of the Texas Water Code, and a request for injunctive relief pursuant to Section 11.0841 of the Texas Water Code to redress the unauthorized diversion. Each of the defendants owed a portion of the slope behind the Bennetts' property. According to the pleadings, man-made changes to the respective properties caused:

> [M]assive quantities of surface water that had been unlawfully, wrongfully, and negligently diverted, retained, and/or impounded [to spill] over, onto and into Plaintiff's property causing property damage.

### Trial Testimony

The Bennetts purchased their home in the 1970s. The backyard was enclosed by a rock wall which contained concrete footings but it was not a retaining wall. Mr. Bennett testified that in 1975, he improved the wall by raising the height. He also created a ditch to help water flow around his yard. Experts on both sides testified that although the rock wall may have been sufficient at the time it was built, a replacement would need to meet more stringent requirements under the updated building code.

Behind the Bennetts' backyard is a slope, at the top of which sit the properties of the three defendants. A drainage plan for the Richmar subdivision was admitted into evidence. It shows a

storm water area drainage area division line extending along the top of the slope between the Bennetts' and Contreras' properties. John Karlsruher testified as the Bennetts' engineering expert. Based on his evaluation of the plans, everything north of the crest line should drain north and everything south of the crest line should drain south.

Karlsruher also discussed several alterations that were made to Contreras' property. A cement slab was added to his backyard. This was a man-made addition which prevented the ground from soaking up water, and diverted the flow of water from his backyard downhill toward the Bennetts' backyard. A wall constructed on Contreras' property, as well as a number of stones aligned on his property, diverted water towards the Bennetts' property. These man-made changes altered the natural flow of water such that a washout gully formed where the water flowed downhill to the Bennetts' property.

Mr. Bennett also testified about the alterations to Contreras' property. Before Contreras added the concrete slab, knee-deep water would pool in his yard. When the water could no longer pool, the washout gully was created. The jury was presented with numerous photographs depicting all the alterations. Finally, Mr. Bennett testified about the destruction of the wall following the August 1, 2006 rainstorm. He described the pristine condition of his backyard before the occurrence, as well as the immense effort it took to remove the debris after the wall collapsed. The Bennetts also introduced testimony as to the cost to replace their wall. Due to newer building codes, they could not erect a wall under the same configuration. Instead, the new wall must be an engineered retaining wall. Plans for the new wall were offered into evidence.

### *The Verdict*

As to the Bennetts' negligence claims, the jury found two proximate causes. They attributed 55 percent of the negligence to the Bennetts, 40 percent to Contreras and 5 percent to Margaret

Aboud. These findings barred the Bennetts' recovery as to their negligence cause of action, but they did not bar recovery under the Texas Water Code. As to those allegations, the jury found that Contreras wrongfully diverted the natural flow of surface water in violation of Section 11.086(a). They awarded $43,000 to restore the Bennetts' wall and backyard to conditions existing before the occurrence. The jury also awarded $25,000 for the diminution in market value of the Bennetts' home.

## SUFFICIENCY OF THE EVIDENCE

In Issues One and Two, Contreras complains that the evidence is legally and factually insufficient because there is no evidence that the Bennetts' rock wall would not have failed *but for* the alleged diversions of surface water. The jury found Contreras liable based on a violation of the Texas Water Code:

> No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue in a manner that damages the property of another by the overflow of the water diverted or impounded.

TEX.WATER CODE ANN. § 11.086(a)(West 2008). The statutory elements are: (1) a diversion or impoundment of surface water which (2) causes (3) damage to the property of the plaintiff landowner. *Kraft v. Langford*, 565 S.W.2d 223, 229 (Tex. 1978),[2] *Bily v. Omni Equities, Inc*, 731 S.W.2d 606, 611 (Tex.App.--Houston [14th Dist.] 1987, writ ref'd n.r.e.). The plaintiff carries the burden to prove the unlawful diversion caused damages to the plaintiff's property which would not have resulted *but for* such unlawful diversion. *Benavides v. Gonzalez*, 396 S.W.2d 512, 514 (Tex.Civ.App.--San Antonio 1965, no writ), *citing Roby v. Hawthorne*, 77 S.W.2d 923, 925

---

[2] *Kraft* recited the elements referring to an earlier codification of the statute (Texas Water Code Section 5.086(a)), which contained wording identical to the codification of the statute at the time of trial (Texas Water Code Section 11.086(a)). *See Kraft*, 565 S.W.2d at 229; TEX.WATER CODE ANN. § 11.086(a).

(Tex.Civ.App.--Dallas 1934, writ dism'd).  The claims for violations of the Water Code are not dependent upon any finding as to Contreras' negligence.  *Bily*, 731 S.W.2d at 611.

John Karlsruher, the Bennetts' engineering expert, testified in detail about certain alterations that were made to the defendants' properties north of the crest line which diverted water toward the Bennetts' property.  In support of his conclusion that the natural flow of water had been altered, Karlsruher referred to:  (1) a wire mesh fence constructed by an unknown party, located at the southeast corner of Contreras' property which the Bennetts' contend was constructed to catch debris; (2) a stack of rocks at the southwest corner of the Aboud's wall;[3] (3) a group of stones or cement which appeared to have been placed on the crest line of Contreras' property; and (4) a concrete slab in Contreras' backyard.  Karlsruher summarized his opinion as follows:

> It is my opinion that in addition to the runoff from the face of the slope, what would have been below the crest, additional water flowed across from the Aboud property onto [Appellant's], across [Appellant's] onto Lozano and down the slope, water that should have been routed to Rocky Bluff or the other street in front that I forget the name of.  But in either case, there was water contributed by the three properties that should have been going to the street that came down the slope into the Bennetts' yard.

Karlsruher stated further that the water was concentrated due to the man-made additions to the properties which, "altered the natural flow of water and contribute[d] to the collapse of Mr. Bennett's back wall."

> Q.      Let me ask you to look at Section 11.086, subsection [a] of the Texas Water Code.  Take just a second to read that, Mr. Karlsruher.  All right.  Based on your experience, Mr. Karlsruher, based on your 26 years of experience in designing drainage plans and implementing those designs in the City of El Paso, during that course of time, and then based on your examination and viewing of the Defendants' property in this case, would it be your testimony that the Defendant in this case diverted or impounded the natural flow of

---

[3] Although these rocks were stacked on the Aboud's property, there was some suggestion at trial that Contreras may have either placed the rocks in that location, or re-stacked the rocks there.

surface waters in this state, or permitted a diversion or impounding by the Defendants to continue in a manner that damages the property of another by overflow of the water diverted or impounded?

A.      Yes.

On cross-examination, he testified as follows:

Q.      So the bottom line is if all of the subdivision above the Plaintiffs' rock fence were in its natural state, but the Plaintiffs had the same rock fence that they had on August 1st, 2006, you can't deny that the flow of water coming down that natural slope would have damaged the Plaintiffs' rock fence and caused it to collapse, correct?

A.      That's correct.

Mr. Bennett also testified regarding the alterations to Contreras' property. Three-fourths of Contreras' backyard was now covered in cement, and a rock wall which had once been on the property was buried at some point, raising the level of Contreras' property. Mr. Bennett had witnessed knee-deep water pooling in Contreras' yard, but because of the cement, all of the water was forced to flow onto the Bennett's property.

First, we address the legal sufficiency challenge. The test for determining whether an alleged causative factor is a "but for" cause is whether the act or omission was a substantial factor in causing the damage, "without which the harm would not have occurred." *Excel Corp. v. Apodaca*, 81 S.W.3d 817, 820 (Tex. 2002), *quoting Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). On appeal, a legal sufficiency or "no evidence" challenge will be sustained if the party suffering the adverse decision at trial shows: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidences establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *El Paso Independent School District v. Pabon,* 214 S.W.3d 37, 41

(Tex.App.--El Paso 2006, no pet.). The jurors are the sole judges of the weight and credibility to give to witness testimony and if the evidence at trial would allow reasonable, fair-minded jurors to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.33d at 819, 822; *Pabon*, 214 S.W.3d at 41. So long as evidence falls within the zone of reasonable disagreement, a reviewing court cannot substitute its own judgment for that of the trier of fact. *City of Keller*, 168 S.W.3d at 819; *Pabon*, 214 S.W.3d at 41. However, if the evidence allows for only one inference, neither the jurors nor the reviewing court may disregard it. *Id.*

In viewing the evidence tending to support the verdict, we find some evidence which tends to support the jury's verdict. While it is true that some of Karlsruher's testimony as to causation is contradictory, it is the province of the jury to resolve the conflicts. In a legal sufficiency review, we look to the evidence favorable to the jury's verdict and determine whether a rational juror could have reached that verdict. Based on the testimony of Karlsruher and Mr. Bennett, a rational juror could have concluded that Contreras' wrongful diversion of surface water was a substantial factor in causing damage to the Bennetts' property. We overrule Issue One.

Next, we address factual sufficiency. After considering all evidence, we conclude that the verdict is not so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *America West Airlines, Inc. v. Tope*, 935 S.W.2d 908, 912 (Tex.App.--El Paso 1996, no writ). While there is no testimony that affirmatively states that Contreras' diversion of surface water was the *only* cause of the Bennetts' damages, there is evidence to support the finding that Contreras' actions were a proximate cause of the damages. Under Texas law, there can be more than one proximate cause.[4] *See Western*

---

[4] The jury found that the Bennetts and Contreras proximately caused the damage through their respective negligence.

*Investments, Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). We overrule Issue Two.

## DAMAGES

In Issue Three, Contreras complains that the Bennetts were awarded damages for both the cost of repairs *and* the diminution in value of the property, because the diminution was calculated assuming that no repairs had been made. Texas law does not permit double recovery. *The Parkway Company v. Woodruff*, 901 S.W.2d 434, 441 (Tex. 1995)(holding that homeowners bringing action in connection with the flooding of their home received improper double recovery when they were allowed an award of both cost of repairs and diminution of value of their home, because the diminution in value was calculated assuming that *no repairs had been* made)(emphasis added). The pertinent jury questions and answers are as follows:

JURY QUESTION NUMBER EIGHT:

What sum of money, if paid now in cash, would fairly and reasonably compensate JAMES ROBERT BENNETT and HILDA M. BENNETT for their damages, if any, that resulted from the occurrence in question?

Consider the elements of damages listed below and none other. Consider each element of damage separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find.

A. Cost to Repair

Consider the reasonable cost in El Paso County, Texas to restore the wall, including the backyard to the condition it was in before the occurrence in question.

Answer in dollars and cents for damages, if any.

Answer:     $43,000.00

B. Difference in Market Value

Consider the difference in market value in El Paso County, Texas, of JAMES ROBERT BENNETT and HILDA M. BENNETT'S property before the occurrence in question and *immediately after the necessary repairs are made to the property* (AND ASSUMING NO ACTION REGARDING THE PROPERTY ABOVE).

'Market Value' means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

Answer in dollars and cents for damage, if any.

Answer:     $25,000

[Emphasis added]. Question 8(b) clearly states that the jury is to calculate damages for diminution in value *after* the necessary repairs are made. As the court explained in *Parkway*:

Damages for diminution in value and damages for cost of repairs are not always duplicative. Diminution in value does not duplicate the cost of repairs if the diminution is calculated based on a comparison of the original value of the property and the value *after repairs are made*. [Emphasis in original].

*Parkway*, 901 S.W.2d at 441. Therefore, there is no double recovery to eliminate.

In his reply brief, Contreras sidesteps the double recovery issue and focuses instead on the sufficiency of the evidence to support the damage award. The Bennetts bore the burden at trial to prove two separate values to recover diminution in value damages: (1) the original value of the property before the damage occurred; and (2) the value of the property after repairs are made. *Parkway*, 901 S.W.2d at 441; *Ludt v. McCollum*, 762 S.W.2d 575, 576 (Tex. 1988). Contreras challenges only the second element, arguing, "Neither Mr. Harville, nor Mr. Bennett, nor any other witness provided testimony or evidence regarding the post-incident value of the Bennetts' home after repairs are made."

*Relevant Testimony from Harville and Bennett*

At trial, Harville testified as the Bennetts' real estate appraisal expert. After the flood, Mr. Bennett asked him to prepare a market analysis for the value of his home. The following testimony was elicited during direct examination:

A:     [Mr. Harville]: I did a market analysis, but what -- it was very unusual. I had to come up with a price on what the property would be worth if it did not have the problems it had. And then I tried to subtract out damage costs, and what I call a little bit of stigma at this situation, due to the fact that it is now a flood-damaged property, and that has to be divulged from here on out.

Q.     Any time a property that's been flood damaged is sold in the future, after the flood damage, what's required of the seller before the property can be listed as sold?

A.     Whether it's listed or whether a seller sells it by themselves, they have to provide a property disclosure statement in the State of Texas, and it asks all kinds of questions about is there any history of flooding. So it has to be divulged to a prospective buyer that the property has a flood damage history.

Q.     And Mr. Bennett's property, based on what you learned about the property, would it fall into that category of a property where that kind of thing would have to be disclosed?

A.     Yes, it would.

Q.      Okay. And as a result of him having to disclose that on any attempt in the future to sell the property, does that impact the value of the home at all?

A.      Yes, it does.

Counsel then asked Harville, based on his experience as a real estate broker, to approximate the impact on the value of the home if the disclosure had to be made. Before Harville answered, defense counsel asked to take him on voir dire and questioned him about his 2006 comparative market analysis.

Q.      [Counsel for Aboud]:  Any of the homes in your analysis that are listed as flood damaged?

A.      No.

Q.      Any of the homes that you analyzed that you knew to have the same kind of damage to them as the Bennetts' home?

A.      No.

Q.      And where did you -- what was the source, then, of your analysis of any economic impact on the value of the Bennetts' home? I'm not asking you what that number was.  I'm asking you for the source of the information.

A.      Okay.  Well, in my value that I gave to him, I took the fair market value and then the cost.  Now, there was another factor in there that I used, diminished value, because of the flood.  Is that the value you're referring to?

Q.      Yes, sir.  What was the basis of your coming up to a diminished value if you did not compare the Bennetts' home with other homes that had sustained flood damage?

A.      It was my opinion just based on experience.

The trial court excused the jury for a brief bench conference on the issue of Harville's qualifications under Rule 702 and whether he had any experience dealing with flood-damaged properties. The Bennetts' attorney asked the trial court to allow him to rehabilitate the witness, and the trial court responded:

[The Court]: I certainly think the market value price without the flood damage is coming in. The problem they've got, as I understand it, is assigning a number to the diminishing value of that home based on the damage, through this witness. If you can find a way to rehab that, go right ahead. Ask your questions. Let's do it now.

Still outside the presence of the jury, the Bennetts' attorney took Harville on voir dire:

Q. Mr. Harville, based on your 31 years of experience as a real estate broker here in El Paso, have you had the opportunity to look at, in the past, flood-damaged properties to consider whether or not to sell or assist the buyer in buying those properties?

A. Not directly, no.

Q. Not directly?

A. No.

[Bennetts' counsel]: Your Honor, I'll just establish the cost of the house and I'll have to call Mr. Bennett then, on rebuttal.

The examination of Harville continued as he was questioned about his report. Based on the comparative market analysis he conducted, he was able to establish an approximate, "preflood, predamaged value for Mr. Bennett's home" of $160,000. Based on his experience and the decline in the housing market, the value would be "a bit lower" than the $160,000 figure stated in his report. He also testified that based on his experience in buying and selling homes in El Paso, he would not list the Bennetts' home because:

[I]t's just part of a good sound management risk program. And when you take on a piece of property, you have to decide whether or not it's going to be worth it. With the disclosures and everything, it would be a very long and difficult sale, and there's always a possibility of it coming back to you in court later on.

On cross-examination, Harville admitted that in his comparative market analysis he suggested a listing price of $155,516. At the time he made the report, and as of the last time he visited the property (approximately two months prior to trial), the rock wall had not been replaced. But he

testified that he still would not list the property, even if he was told a properly-engineered retaining wall had been built and that the engineer who designed the wall stated that the newly designed wall would withstand "any further damage from flooding, from water, soil, debris coming down that slope back there, and that there would be no further damage."

Finally, Harville was asked whether he had taken into consideration that the only physical damage to the Bennetts' property was to the rock wall itself, and that there was no damage to the front yard, the exterior of the house, or its interior. Harville responded, "Yes, I did."

The following is Mr. Bennett's rebuttal testimony in its entirety:

Q. [Counsel for the Bennetts]: Mr. Bennett, you were in the courthouse when Mr. Harville testified. Is that correct?

A. Yes, sir.

Q. And you heard Mr. Harville's testimony regarding the market value of your house in 2006 when he first looked at this issue. Is that correct?

A. That's correct.

Q. And it was $160,000?

A. That's correct.

Q. And he said that by this day and time he would estimate that the market value, based on the market itself, of your home in its undamaged state would be approximately $140,000.[5] Is that correct?

A. That's correct.

Q. All right. Mr. Bennett, as the owner of the property there on Murchison Drive, what do you believe that the market value of your home is in its damaged state?

[Objections and side bar omitted]

---

[5] Despite a review of the entire record, it is unclear where this number originated.

A.    $81,500.

Q.    Okay. And that's -- that's your belief of the market value, what somebody might pay for your home if they were to come and look at your home -- and when I say your home I mean your home and your property.  Do you understand that?

A.    Yes, sir.

Q.    Okay. What they might pay for your home today?

A.    That's correct. $81,500.

Q.    Okay. If we were to -- if we were [sic] to the difference between Mr. Harville's testimony regarding what the market value of your home would be today in its undamaged state and your testimony regarding the value of your home in its damaged state, what would be the diminution in value in your home?

A.    Approximately fifty some odd thousand dollars.

Q.    All right.

As a threshold matter, the evidence must be legally and factually sufficient to support an award of diminution in value damages.  Here, Harville testified regarding the stigma associated with flood damaged properties, and specifically stated that even though there was no damage to the house or the front yard and even if a new properly-engineered retaining wall were erected, he would not list the house for sale.  If we assume, without deciding, that Harville's testimony regarding the negative impact on a home's value after flood damage is sufficient to sustain an award for diminution in value damages, the Bennetts' still had to prove the value of those damages.  *See Royce Homes, L.P. v. Humphrey*, 244 S.W.3d 570, 575-77 (Tex.App.--Beaumont 2008, pet. denied)(finding that diminution in value, or "stigma" damages may be allowed under Section 11.086(a), where a real estate appraiser, who was familiar with flooded properties testified that flooded homes, even when the flood occurs only once, generally suffer a diminished market value and opined that the flood in

that case would diminish the value of the plaintiff's home, but that the evidence proving the amount of damages must still withstand a sufficiency challenge).[6]

Although the Bennetts proved the fair market value of the home before any damage occurred, there is no evidence to support the value of the home if it were listed for sale in a post-flood, post-repaired state. Mr. Bennett's testimony merely established a value of the home *as is.* Accordingly, we sustain Issue Three.

## CONCLUSION

We reverse and render that the Bennetts take nothing in diminution damages. We modify the judgment to delete that recovery and affirm the judgment as modified.

December 22, 2011

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Chew, C.J. (Senior), Bramblett, Judge
Chew, C.J. (Senior), sitting by assignment
Bramblett, Judge, sitting by assignment

---

[6] We note that neither party has directed us to any case law which allows for diminution of value damages where the home itself was not flooded and the backyard sustained all of the damage.